329 Md. 188 (1993)
618 A.2d 744
DEANNA MACK
v.
RONALD E. MACK.
No. 29, September Term, 1992.
Court of Appeals of Maryland.
February 2, 1993.
C. Christopher Brown (Rachel A. Wohl, Brown, Goldstein & Levy, all on brief), Baltimore, for petitioner.
Leslie Fried (Legal Aid Bureau, Silver Spring), Joan O'Sullivan (Legal Aid Bureau, Annapolis), Eileen Franch (Legal Aid Bureau, Baltimore), amicus curiae.
Gary I. Strausberg (Wayne M. Willoughby, Randal D. Getz, Janet & Strausberg, all on brief), Baltimore, Edward J. Gillis (Royston, Mueller, McLean & Reid, both on brief), Towson, for respondent.
Timothy J. Keay (Dept. of Family Medicine, Baltimore), amicus curiae.
Jack Schwartz, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Mary O'Malley Lunden, Asst. Atty. Gen., all on brief), Baltimore, amicus curiae.
Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, and ROBERT M. BELL, JJ.
RODOWSKY, Judge.
This case involves an application to withhold nutrition and hydration administered through a gastrostomy tube to a previously competent, adult, hospital patient who has been in a persistent vegetative state since June 1983, but who is not terminally ill. Because the evidence was inconclusive concerning any intent that the patient had, or would have, concerning the continuation or withholding of artificial nutrition and hydration under these circumstances, the circuit court concluded that Maryland law did not authorize the withholding of life support. As we explain below, we agree.
The patient is Ronald W. Mack (Ronald), born July 11, 1962. He is a high school graduate. He and the appellant, Deanna Mack (Deanna), were married in November 1980. They have two children who live with their mother. In November 1982, Ronald enlisted in the Army. While stationed in California, in June 1983, he was involved in an automobile accident in which he suffered massive brain injuries. He never regained consciousness after the accident.
Ronald was weaned off of a respirator, but he has remained in a persistent vegetative state. His biological bodily functions continue because his brain stem is intact, but his cerebral hemispheres are so damaged that he is incapable of cognitive activity. The distinguishing feature of a patient in a persistent vegetative state is wakefulness without awareness. These patients commonly make sporadic movements, spontaneously blink their eyes, and have heightened reflex responses, but they cannot voluntarily respond to stimuli.
Ronald was transferred from California in September 1983 to the Fort Howard Veterans' Hospital in Baltimore County to be closer to his family. In addition to his wife and children, Ronald's immediate family includes his father, a widower, the appellee, Ronald E. Mack (Ronald, pere), and Ronald's younger sister, Karen Mack Carson, both of whom live within twenty minutes driving time of the hospital. Ronald has remained at Fort Howard Hospital to date.
Over the years of inactivity, the muscles in Ronald's arms and legs have become moderately spastic. His legs are straight and resist bending, while his arms are flexed, with the hands clenched, and resist straightening. Ronald is incontinent of bowel and bladder. He has a tracheotomy through which his lungs' secretions are periodically suctioned. He is unable to chew or to swallow; therefore, he is fed through the gastrostomy tube.[1] The circuit court found that, in Ronald's case, there is "no medically reasonable expectation of recovery or cognitive movement," and that "Ronald is not experiencing pain."
In May 1984, Deanna was appointed guardian of Ronald's person by the Circuit Court for Baltimore County.
Deanna moved to Florida with the two children in September 1984. She had met another man who moved to Florida with her where they lived together for five to six years. Deanna's third child was born in October 1985 out of that relationship.
Acting on the advice of the Veterans Administration and for its convenience, Deanna, in October 1985, obtained appointment as guardian of Ronald's person by decree of the Circuit Court for Marion County, Florida. She was discharged as guardian under the Maryland appointment by order of the Circuit Court for Baltimore County in December 1985.
After moving to Florida, Deanna has visited Ronald three to four times a year. Ronald's sister testified that she visits him "regularly" at Fort Howard Hospital. Ronald, pere, testified that he visits his son usually once a week, with occasional intervals of two weeks between visits.
Sometime prior to May 11, 1991, Deanna learned through conversation with a registered nurse that it might be possible to have Ronald's gastrostomy tube removed. She consulted counsel in Florida. On May 11, a Saturday, Ronald, pere, and Mrs. Carson, acting pro se, filed with the United States District Court for the District of Maryland a paper that the court treated as a complaint and application for a temporary restraining order against the Veterans Administration. The two complainants alleged that Deanna was seeking to have a state court in Florida order the Veterans Administration to transfer Ronald to a veterans hospital in Florida where she would petition to have the court consider removal of life support from Ronald. The federal court in Maryland granted the requested ex parte order and, after a hearing, entered a preliminary injunction maintaining the status quo, pending determination of whether Deanna was the duly authorized guardian of the person of Ronald.
Ronald, pere, then petitioned the Circuit Court for Baltimore County for appointment as guardian of Ronald's person, and Deanna filed a cross petition seeking either confirmation of her guardianship status, based on the Florida decree, or appointment by the Maryland court. The circuit court promptly held a hearing. Ronald, pere, arguing that his appointment as guardian was in Ronald's best interest, emphasized the proximity of Ronald's father and sister to Fort Howard Hospital. The circuit court ruled that the Florida decree appointing Deanna as guardian was not entitled to full faith and credit because the Florida court had no jurisdiction over Ronald's person. The circuit court also determined to appoint a temporary guardian, naming Edward J. Gilliss, who had served as appointed counsel for Ronald. The permanent guardianship appointment was to be made at a later date, and, according to a prehearing letter sent from the circuit judge to the litigants, would "be based on a number of factors, most notably, the withdrawing of sustenance."
In pretrial memoranda, Deanna argued, inter alia, that the Circuit Court for Baltimore County should order withdrawal of Ronald's feeding tube. That issue was treated as the principal one at the full hearing in this case, although that relief had never been requested in a pleading.
In a written opinion that exhaustively reviewed the authorities, the circuit court concluded that, absent either a living will or a power of attorney for health care, the decision to withhold sustenance should be based on what intent Ronald had, or would have, as determined under a clear and convincing standard of proof. On those aspects of the case, the circuit court concluded:
"The underlying facts, produced through testimony, concerning the life and statements of Ronald W. Mack, prior to the accident, are not that remarkable or unexpected. Through his father and sister, who desire to hold onto his life, there is recollection of a Ronald who loved life, who would hold onto life, and who had thanked his father for attempting to keep his mother alive at a time she had experienced a cerebral hemorrhage, even though that probably would have meant that his mother would have survived only in a vegetative state. From Deanna Mack, there is recollection of an incident, when the couple visited Ronald's infirm grandmother, that he commented he would not want to live if he could not do for himself. He had also expressed to Deanna his gratefulness that a friend had died and did not have to suffer, when that friend had been shot. There was testimony that Ronald hated hospitals, doctors, medicine, and confinement. Deanna points to his love of life and sports as an indication he would not want to live in his present unconscious and confined state.
"The conflicting and non-definitive testimony, recollection and impression from various individuals, eight years ago, does not convince the court, of what intent Ronald W. Mack had or would have if faced with the situation which presently confronts him.
"Accepting the truth of all of the statements made, this court is unable to attribute to any one of them or all of them a probative value dispositive of the issue, one way or the other, by clear and convincing evidence. If anything, the evidence produces a stalemate. Nothing in the content or context of the evidence makes it reliable as an indicator of what Ronald would elect to do were he faced with the plight that now confronts him."
Because Ronald is not in pain, the circuit court would not base a decision on its own view of whether Ronald's interest would be better served by continuing or withholding sustenance, and the court would not base a decision on its view of what reasonable persons generally might think was in Ronald's best interest.
Although recognizing that Deanna, as Ronald's spouse, was accorded a priority for appointment as guardian of Ronald by Md.Code (1974, 1991 Repl.Vol.), ง 13-707(a) of the Estates and Trusts Article (ET), the circuit court appointed Ronald, pere, as guardian. The court explained that this was "because it is the father of the ward who will carry into effect the applicable law of Maryland which requires the disabled's life to be continued through the administration of food and water." Inasmuch as Deanna had stated her intention not to continue artificial nutrition and hydration, "[h]er known and avowed desires are not consistent with the objectives and directives of Maryland law[,] and the court cannot repose its confidence in her by appointing her as Guardian."
Deanna appealed to the Court of Special Appeals. Prior to consideration of the matter by that court, she petitioned this Court for, and we issued, a writ of certiorari.
In addition to briefs on behalf of Deanna and of Ronald, pere, the attorney for Ronald has filed a brief as appellee, supporting the circuit court decision in all respects. Legal Aid Bureau, Inc. has filed an amicus brief urging this Court to adopt guidelines for determining when life support can be withdrawn from a patient in a persistent vegetative state, but no specific guidelines are urged in that brief. Doctor Timothy James Keay, of the University of Maryland School of Medicine, has filed an amicus brief urging Deanna's appointment as guardian and urging the adoption of guidelines. Dr. Keay submits, inter alia, that current medical ethics permit discontinuing feeding Ronald through the gastrostomy tube.
The State, through the Attorney General of Maryland, has also filed an amicus brief. The State advocates the position taken in two opinions of the Attorney General that have addressed the legal questions involved in withholding sustenance both from terminally ill patients and from patients in a persistent vegetative state. 75 Op.Att'y Gen. ___ (1990) [Op. No. 90-044 (Sept. 24, 1990)], reprinted in 17:22 Md. Reg. 2635 (Nov. 2, 1990), and 73 Op. Att'y Gen. 162 (1988). Applying the principles adopted in those opinions, the Attorney General submits that the circuit court's refusal to appoint Deanna as guardian was error, but that the court's use of a clear and convincing standard and its refusal to make a best interest evaluation were correct.
From all of the briefs and arguments, we distill the following four legal issues.
1. Is the order of the Florida court appointing Deanna guardian of the person of Ronald entitled to full faith and credit?
We shall hold that the order is not entitled to full faith and credit.
2. Did the circuit court base its refusal to honor Deanna's statutory priority for appointment as guardian of Ronald on a ground that constituted good cause?
We shall hold that the basis relied upon by the circuit court did not constitute good cause.
3. Did the circuit court err in applying a clear and convincing standard of proof to determine Ronald's intent?
We shall hold that the correct standard was applied.
4. Should the issue of withdrawal of life support be remanded to the circuit court for the determination of Ronald's best interest under guidelines laid down by this Court?
We shall hold that, under the circumstances here, the so-called "best interest" standard for withdrawal of life support involves a quality-of-life judgment which, if it is to be made at all, should be made only under guidelines established by the General Assembly.

I
The mandate of Art. IV, ง 1 of the United States Constitution, requiring courts in each state to accord full faith and credit to judgments of courts in other states, is not absolute. A court, for example, need not give full faith and credit to a judgment that was rendered by a court lacking jurisdiction. Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Assoc., 455 U.S. 691, 704, 102 S.Ct. 1357, 1366, 71 L.Ed.2d 558, 570 (1982); Durfee v. Duke, 375 U.S. 106, 110, 84 S.Ct. 242, 244, 11 L.Ed.2d 186, 190 (1963); Van Wagenberg v. Van Wagenberg, 241 Md. 154, 160, 215 A.2d 812, 815, cert. denied, 385 U.S. 833, 87 S.Ct. 73, 17 L.Ed.2d 68 (1966). It is proper for a forum court to examine the jurisdiction of the deciding court to determine whether the foreign judgment must be accorded full faith and credit. Milliken v. Meyer, 311 U.S. 457, 462, 61 S.Ct. 339, 342, 85 L.Ed. 278, 282-83 (1940); Van Wagenberg, 241 Md. at 160, 215 A.2d at 815; Coane v. Girard Trust Co., 182 Md. 577, 580, 35 A.2d 449, 451 (1944).
Jurisdiction to appoint a guardian over the person of an incompetent or disabled individual lies with the state where that individual is domiciled or present. Restatement (Second) of Conflict of Laws ง 79 (1971);[2]see E. Scoles & P. Hay, Conflict of Laws ง 22.27, at 881 (1984). Morrissey v. Rodgers, 137 Kan. 626, 21 P.2d 359 (1933), held that Kansas courts would not be required to give full faith and credit to a Nebraska court's guardianship determination if the ward was domiciled in Kansas at the time the Nebraska judgment was rendered. The Nebraska court would have been without jurisdiction to render judgment in the guardianship proceeding. Id. at 632-33, 21 P.2d at 362; see Henry v. Edde, 148 Kan. 70, 73-74, 79 P.2d 888, 891 (1938).
The state in which a ward is domiciled has primary jurisdiction to appoint a guardian because that state's interest in protecting the ward is strong, and because that state is the "most deeply concerned with his welfare." Restatement (Second) of Conflict of Laws ง 79, cmt. a (1971); Scoles & Hay, supra, ง 22.27, at 881. If a ward is physically present within a state, that state has an interest in protecting, and direct access to, the ward, and therefore has jurisdiction over guardianship matters if there is some immediate need to protect the ward. Restatement (Second) of Conflict of Laws ง 79, cmt. a (1971); Scoles & Hay, supra, ง 22.27, at 881.
Although Maryland appellate courts have not spoken on jurisdiction in the guardianship context, cases dealing with jurisdiction in child custody matters are analogous. See M. Paulsen & J. Best, Appointment of a Guardian in the Conflict of Laws, 45 Iowa L.Rev. 212, 212 (1960) ("The jurisdictional principles governing the appointment of a guardian of the person are similar to those employed in deciding whether a state may award the custody of a child." (Footnote omitted)). This Court has said that "a state court has jurisdiction to determine custody of a child only if the domicile of the child is within the state." Miller v. Miller, 247 Md. 358, 362, 231 A.2d 27, 30 (1967); see Naylor v. Naylor, 217 Md. 615, 626-28, 143 A.2d 604, 608-10 (1958) (refusing to give full faith and credit to a custody determination of a Nevada court on lack of jurisdiction grounds because the children were domiciled in Maryland); Zouck v. Zouck, 204 Md. 285, 301-02, 104 A.2d 573, 580-81 (1954). Quoting from Nelson on Divorce ง 15.32, at 287 (2d ed. 1945), Miller stated:
"`A proceeding to determine custody of a minor child partakes of the nature of an action in rem, the res, or the subject matter, being the child's status or his legal relationship to another. If the court does not have jurisdiction of the children it does not have jurisdiction of the subject matter to determine the right to custody....'"
247 Md. at 363, 231 A.2d at 30.
Inasmuch as the state of Ronald's domicile has always been Maryland, under the jurisdictional analysis of this status determination that looks at the problem from the standpoint of an action in rem, Florida did not have jurisdiction.
Deanna's arguments have as their premises in personam jurisdictional analyses. She submits that the Florida court had personal jurisdiction over Ronald based on her consent to Florida's jurisdiction, given while she was court-appointed guardian in Maryland. She also submits that Ronald had sufficient minimum contacts with Florida.
The relationship of guardian to ward is not that of agent to principal. Parker v. Wilson, 99 Ark. 344, 345, 137 S.W. 926, 926 (1911). The guardian's authority is not derived from the ward, but from the appointing court for which the guardian acts as agent, exercising those powers conferred by statute or by the court. Thus, Deanna, simply by virtue of having been named guardian of Ronald by the Maryland court, could not appear in a Florida court and consent, for Ronald, to the exercise by the Florida court of jurisdiction over the person of Ronald.
We described the relationship between court and guardian in Kicherer v. Kicherer, 285 Md. 114, 400 A.2d 1097 (1979): "In reality the court is the guardian; an individual who is given that title is merely an agent or arm of that tribunal in carrying out its sacred responsibility." Id. at 118, 400 A.2d at 1100. The administration of guardianship affairs remains subject to judicial control by the equity court that appointed the guardian. Id. at 119, 400 A.2d at 1101.
ET ง 13-708 limits the powers of a guardian to those "necessary to provide for the demonstrated need of the disabled person." Here, although it may have been more convenient or advantageous for Deanna or the Veterans Administration to proceed in a Florida court, the Maryland guardianship court did not determine Ronald's "need" to submit to the jurisdiction of the Florida court. Had Deanna sought to change Ronald's place of abode "within [or] without the State [of Maryland]," an order of the Circuit Court for Baltimore County would have been required. ET ง 13-708(b)(2). Thus, Deanna, by her unilateral consent, could not place Ronald's person under the jurisdiction of the court of another state while Ronald remained in Maryland as a ward of a Maryland court.
We shall assume, arguendo, the validity of Deanna's premise that minimum contacts between a ward and a state, sufficient to support in personam jurisdiction over the ward in an action, will also be sufficient for appointment of a guardian of the person. But, Ronald's contacts are insufficient. Ronald never lived in the State of Florida. There is no evidence that he ever intended to live in Florida. Rather, Deanna argues that because she, Ronald's wife, and his children live in Florida and because his veterans benefits checks are mailed to Florida, Florida could exercise personal jurisdiction over him. The minimum contacts test of International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945), rests on "`traditional notions of fair play and substantial justice.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), held that, to be subject to a foreign court's jurisdiction, nonresidents must have purposefully availed themselves of the privilege of conducting activity within that state and of the benefits and protection of the laws of that state. This requirement "ensures that a [non-resident] will not be haled into a jurisdiction solely as a result of `random,' `fortuitous,' or `attenuated' contacts or of the `unilateral activity of another party or a third person.'" Id. at 475, 105 S.Ct. at 2183, 85 L.Ed.2d at 542 (citations omitted).
Kulko v. Superior Court, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), demonstrates the absence of personal contact or purposeful availment here. The parties in Kulko had entered into a divorce settlement and child custody agreement in New York and procured a divorce in Haiti. The wife moved to California, and the husband and children remained in New York. After the children decided to move to California to live with their mother, she brought suit in a California court to modify custody. Id. at 87-88, 98 S.Ct. at 1694, 56 L.Ed.2d at 138. The husband argued that the California court did not have personal jurisdiction over him. The Supreme Court agreed, concluding that "the mere act of sending a child to California to live with her mother ... connotes no intent to obtain or expectancy of receiving a corresponding benefit in the State that would make fair the assertion of that State's judicial jurisdiction." Id. at 101, 98 S.Ct. at 1701, 56 L.Ed.2d at 147.
Given that Ronald could not consent to their change of abode, the presence of his wife and children in Florida does not give Florida courts jurisdiction over him. Further, the fact that his benefit check arrives in Florida may be grounds for a Florida court to exercise jurisdiction over those funds, see Shaffer v. Heitner, 433 U.S. 186, 207-08, 97 S.Ct. 2569, 2581-82, 53 L.Ed.2d 683, 699-700 (1977), but it does not give the Florida courts jurisdiction over his person. Cf. In re Guardianship of Sall, 59 Wash. 539, 548, 110 P. 32, 36 (1910).
The Florida court judgment appointing Deanna guardian of the person of Ronald is not entitled to full faith and credit.

II
Even if the Florida appointment of Deanna as guardian is not entitled to full faith and credit, Deanna argues that she is entitled to be appointed guardian under the priorities set forth in ET ง 13-707(a) and that there was not good cause for passing over her priority and appointing Ronald, pere, guardian. Section 13-707(a), in relevant part, provides:
"Persons are entitled to appointment as guardian of the person according to the following priorities:
(1) A person ... nominated by the disabled person...;
(2) His spouse;
(3) His parents[.]"
Subsection (c)(1) of ง 13-707 further provides:
"Among persons with equal priority the court shall select the one best qualified of those willing to serve. For good cause, the court may pass over a person with priority and appoint a person with a lower priority."
Kicherer, 285 Md. 114, 400 A.2d 1097, addressed a petition for guardianship of the person of an incompetent adult that was filed after the enactment, by the Acts of 1977, Chapter 768, of ET ง 13-707. We recognized that "consanguinity is a factor that may well be given consideration by the chancellor in the appointment of a guardian because nearest of kin are more likely to treat a ward with kindness and affection," citing, inter alia, ET ง 13-707. Kicherer, 285 Md. at 119, 400 A.2d at 1100-01. Nevertheless, we said that "all the parties here should be reminded that appointment to that position rests solely in the discretion of the equity court." Id., 400 A.2d at 1101. A statutory preference in the appointment of a guardian, although seemingly mandatory and absolute, is always subject to the overriding concern of the best interest of the ward. Marsh v. Hoff, 15 Ark. App. 272, 692 S.W.2d 270, 272 (1985); Monroe v. Dallas, 6 Ark. App. 10, 636 S.W.2d 881, 883 (1982); In re Guardianship and Conservatorship of Ankeney, 360 N.W.2d 733, 736-37 (Iowa 1985); In re Guardianship of T.D.S. and J.L.S., 13 Kan. App.2d 275, 769 P.2d 32, 33-34 (1989); Brown v. Storz, 710 S.W.2d 402, 405 (Mo. App. 1986).
Here, there was no finding whether Deanna could or would fulfill the duties of guardian. There was no finding on Ronald, pere's, contention that his geographical proximity to Ronald weighted the best interest scale in favor of appointing the father as guardian.[3] Rather, the circuit court merged the issue of whether sustenance could be withdrawn into the issue of who should be guardian. Because the court concluded that Maryland law required sustenance to be continued, the court concluded that Deanna's desire to have sustenance withdrawn constituted good cause to pass over Deanna's statutory priority and to appoint Ronald, pere. That assigned reason does not constitute good cause.
Where there is a guardian for a disabled person, it is not within the exclusive power of the guardian to effect withdrawal of sustenance.[4] ET ง 13-708 at the time of the judgment below, in relevant part, provided:
"(a) In general. โ The court may grant to a guardian of a person only those powers necessary to provide for the demonstrated need of the disabled person.
(b) Nonexclusive enumeration of permissible powers. โ Subject to subsection (a) of this section, the rights, duties, and powers which the court may order include, but are not limited to:
....
(8) The power to give necessary consent or approval for:
(i) Medical or other professional care, counsel, treatment, or service;
(ii) Withholding medical or other professional care, counsel, treatment, or service; and
(iii) Withdrawing medical or other professional care, counsel, treatment, or service.
(c) Medical procedures. โ Notwithstanding the powers conferred to a guardian under subsection (b)(8) of this section, where a medical procedure involves, or would involve, a substantial risk to the life of a disabled person, the court must authorize a guardian's consent or approval for:
(1) The medical procedure;
(2) Withholding the medical procedure; or
(3) Withdrawing the medical procedure that involves, or would involve, a substantial risk to the life of the disabled person."
As we shall see in Part IV, infra, court decisions dealing with withdrawing artificially administered nutrition and hydration from a patient who is in a persistent vegetative state analogize the legality of the withdrawal to the cessation of medical treatment for a terminally ill patient. It is beyond dispute that more than a substantial risk to the life of the patient in a persistent vegetative state is involved when the feeding tube is withdrawn. Under those circumstances, the guardian cannot effect withdrawal of the treatment solely by virtue of appointment as guardian.
Maryland law, particularly ET ง 13-708(c), recognizes, however, that a guardian of the person may apply to a court to have medical procedures withheld even if a substantial risk to life is involved.[5] Thus, there is no conflict between Maryland law and Deanna's effort to obtain court approval for the withholding of sustenance. Deanna's views are consistent with the statutory requirement. Her views recognize the need, under the circumstances here, for court approval. Her views are not per se disqualifying from appointment as guardian, although the court may consider them as a factor in an overall determination.[6]
Inasmuch as the circuit court did not address the other arguments advanced by the parties on the issue of who should be guardian, but decided the issue by treating Deanna as disqualified, the order appointing Ronald, pere, as guardian will be vacated, and that issue will be remanded to the Circuit Court for Baltimore County for further proceedings consistent with this opinion.
There remains for decision, however, what is in effect Deanna's application, viewed either as the spouse of Ronald or as a spouse seeking guardianship, for court approval to have artificially administered sustenance withheld from Ronald.

III
The circuit court correctly held that the burden was on Deanna to prove, by clear and convincing evidence, that Ronald's judgment was, or would be, that life-sustaining measures should be withdrawn were he to be in a persistent vegetative state.
States may constitutionally require that proof of the critical facts in cases involving the withholding or withdrawal of life-sustaining medical treatment meet the clear and convincing standard. Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 282, 110 S.Ct. 2841, 2854, 111 L.Ed.2d 224, 245-46 (1990). Nancy Cruzan was in a persistent vegetative state. Relying on Missouri's policy of strongly favoring the preservation of life, and concluding that the patient's statements were not sufficiently reliable to indicate clearly and convincingly her desires, the Supreme Court of Missouri had reversed an order permitting the cessation of sustenance. The Supreme Court found no constitutional violation, on the following rationale:
"We think it self-evident that the interests at stake in the instant proceedings are more substantial, both on an individual and societal level, than those involved in a run-of-the-mine civil dispute. But not only does the standard of proof reflect the importance of a particular adjudication, it also serves as `a societal judgment about how the risk of error should be distributed between the litigants.' Santosky [v. Kramer], 455 U.S. [745,] 755, 102 S.Ct. [1388,] 1395[, 71 L.Ed.2d 599, 607 (1982)]; Addington [v. Texas], 441 U.S. [418,] 423, 99 S.Ct. [1804,] 1807-1808[, 60 L.Ed.2d 323, 329 (1979)]. The more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision. We believe that Missouri may permissibly place an increased risk of an erroneous decision on those seeking to terminate an incompetent individual's life-sustaining treatment. An erroneous decision not to terminate results in a maintenance of the status quo; the possibility of subsequent developments such as advancements in medical science, the discovery of new evidence regarding the patient's intent, changes in the law, or simply the unexpected death of the patient despite the administration of life-sustaining treatment, at least create the potential that a wrong decision will eventually be corrected or its impact mitigated. An erroneous decision to withdraw life-sustaining treatment, however, is not susceptible of correction."
Id. at 283, 110 S.Ct. at 2854, 111 L.Ed.2d at 245.
This Court has held that "in any tort case a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages." Owens-Illinois, Inc. v. Zenobia, 325 Md. 420, 469, 601 A.2d 633, 657 (1992). "Any" tort case includes the run-of-the-mine. Under Wentzel v. Montgomery Gen. Hosp., Inc., 293 Md. 685, 703, 447 A.2d 1244, 1253-54 (1982), cert. denied, 459 U.S. 1147, 103 S.Ct. 790, 74 L.Ed.2d 995 (1983), the clear and convincing evidence standard applies to proof of facts justifying sterilization of an incompetent ward at the request of the guardian. No lesser standard should be applied to deciding facts that will determine whether to withdraw life-sustaining treatment from a patient.
Further, the overwhelming majority of cases involving requests to withdraw sustenance from a person in a persistent vegetative state have required the proponent of withholding or withdrawing life support to bear the burden of proving by clear and convincing evidence that the ward's decision would have been to forego life support. And we so hold as well. See, e.g., Rasmussen v. Fleming, 154 Ariz. 207, 741 P.2d 674, 691 (1987); McConnell v. Beverly Enterprises-Connecticut, Inc., 209 Conn. 692, 553 A.2d 596, 605 (1989); In re Guardianship of Browning, 543 So.2d 258, 273 (Fla. Dist. Ct. App. 1989), aff'd, 568 So.2d 4 (Fla. 1990); In re Estate of Greenspan, 137 Ill.2d 1, 146 Ill.Dec. 860, 868, 558 N.E.2d 1194, 1202 (1990); In re Estate of Longeway, 133 Ill.2d 33, 139 Ill.Dec. 780, 788, 549 N.E.2d 292, 300 (1989); In re Swan, 569 A.2d 1202, 1206 (Me. 1990); In re Gardner, 534 A.2d 947, 953 (Me. 1987); Cruzan v. Harmon, 760 S.W.2d 408, 425 (Mo. 1988), aff'd sub nom. Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); In re Jobes, 108 N.J. 394, 529 A.2d 434, 443 (1987); In re Peter, 108 N.J. 365, 529 A.2d 419, 425 (1987); In re Westchester County Medical Ctr., 72 N.Y.2d 517, 534 N.Y.S.2d 886, 891, 531 N.E.2d 607, 612 (1988); In re Storar, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 274, 420 N.E.2d 64, 72, cert. denied sub nom. Storar v. Storar, 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); Leach v. Akron Gen. Medical Ctr., 68 Ohio Misc. 1, 22 O.O.3d 49, 426 N.E.2d 809, 815 (Com.Pl. 1980). But see In re Guardianship of Doe, 411 Mass. 512, 583 N.E.2d 1263, 1271, cert. denied sub nom. Doe v. Gross, ___ U.S. ___, 112 S.Ct. 1512, 117 L.Ed.2d 649 (1992) (upholding the following standard: "a preponderance of the evidence with an extra measure of evidentiary protection by reason of specific findings of fact after a careful review of the evidence").
Deanna vigorously argues that the playing field should not, in all cases, be tilted in favor of "life" and against "death," recognizing that "[t]his grim dichotomy seems to leave little room for debate on the issue." Appellant's Brief at 35. Deanna argues that the "issue is whether [Ronald] will have a vegetative existence for the next three or four decades helplessly dependent on others, without any pleasure.... Thus, the quality of his very existence is at stake." Id. at 36. Deanna "submits that this grim, degrading result cannot be one that public policy, however defined, can be deemed to favor," so that "this court should not enhance it by adopting an unusual standard of proof." Id.
Deanna's argument, in essence, would have the standard of proof vary, based on the quality of life of the patient. Whether a court, in the absence of legislative guidelines, should undertake to evaluate the quality of the ward's life is a question which we answer, in the negative, in Part V.

IV
Measured against the developing body of law concerning withdrawing life support from terminally ill patients, or from patients in a persistent vegetative state, the facts in this case are determinative. That conclusion can be demonstrated by an overview of the law on this subject. We shall simply sketch the path of general reasoning from the basic right to the particular application sought here by Deanna.
This Court recognizes the doctrine of informed consent as part of the common law. The doctrine "follows logically from the universally recognized rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient." Sard v. Hardy, 281 Md. 432, 438-39, 379 A.2d 1014, 1019 (1977). "The fountainhead of the doctrine ... is the patient's right to exercise control over his own body, ... by deciding for himself whether or not to submit to the particular therapy." Id. at 439, 379 A.2d at 1019. A corollary to the doctrine is the patient's right, in general, to refuse treatment and to withdraw consent to treatment once begun.[7]
Some courts have held that a person's right to refuse treatment is based on a federal or state constitutional right of privacy. See, e.g., Rasmussen v. Fleming, 154 Ariz. 207, 741 P.2d 674, 682 (1987) (federal and state); Bouvia v. Superior Court, 179 Cal. App.3d 1127, 225 Cal. Rptr. 297, 301 (1986) (federal and state); In re Severns, 425 A.2d 156, 158 (Del. Ch. 1980) (federal); In re A.C., 573 A.2d 1235, 1244-47 (D.C. 1990) (federal); In re Guardianship of Browning, 543 So.2d 258, 267 (Fla. Dist. Ct. App. 1989) (state), aff'd, 568 So.2d 4 (Fla. 1990); Brophy, 497 N.E.2d at 633 (federal); Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417, 424 (1977) (federal); In re Quinlan, 70 N.J. 10, 355 A.2d 647, 663 (federal and state), cert. denied sub nom. Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); Leach v. Akron Gen. Medical Ctr., 68 Ohio Misc. 1, 22 O.O.3d 49, 426 N.E.2d 809, 814 (Com.Pl. 1980) (federal); In re Colyer, 99 Wash.2d 114, 660 P.2d 738, 742 (1983) (federal and state). Although the United States Supreme Court's decision in Cruzan, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224, made no holding on the subject, all of the justices, save Justice Scalia, either flatly stated or strongly implied that a liberty interest under the Fourteenth Amendment gives rise to a constitutionally protected right to refuse life saving hydration and nutrition. See id. at 278, 110 S.Ct. at 2851, 111 L.Ed.2d at 241-42; id. at 287, 110 S.Ct. at 2856, 111 L.Ed.2d at 247-48 (O'Connor, J., concurring); id. at 304-05, 110 S.Ct. at 2865, 111 L.Ed.2d at 257 (Brennan, Marshall, and Blackmun, JJ., dissenting); id. at 331, 110 S.Ct. at 2879, 111 L.Ed.2d at 275 (Stevens, J., dissenting).
In the case now before us, there is no issue that turns on whether the right to refuse treatment is a constitutional or common-law right. It is sufficient for present purposes to decide this case under the Maryland common-law right of a competent adult to refuse treatment. For cases in which the court found no need to opine beyond a common-law analysis, see Barber v. Superior Court, 147 Cal. App.3d 1006, 195 Cal. Rptr. 484 (1983); In re Estate of Longeway, 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 (1989); In re Gardner, 534 A.2d 947 (Me. 1987); In re Peter, 108 N.J. 365, 529 A.2d 419 (1987); In re Conroy, 98 N.J. 321, 486 A.2d 1209 (1985); In re Storar, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64, cert. denied sub nom. Storar v. Storar, 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); In re Delio, 129 A.D.2d 1, 516 N.Y.S.2d 677 (1987).
Patients who are unable to exercise the right to refuse treatment for themselves, nevertheless still enjoy the right. See Browning, 543 So.2d at 267; Brophy, 497 N.E.2d at 634; Saikewicz, 370 N.E.2d at 427; Peter, 529 A.2d at 423; Conroy, 486 A.2d at 1229; Storar, 438 N.Y.S.2d at 273-74, 420 N.E.2d at 71-72; see also 73 Op.Att'y Gen. 162, 175-78 (1988).
The General Assembly has recognized the continuing nature of the right to refuse treatment. Chapter 709 of the Acts of 1990 expressly provided that the right may be exercised on behalf of a disabled person by that person's guardian and, specifically, "where a medical procedure involves, or would involve, a substantial risk to the life of a disabled person," the right may be exercised by the guardian with court authorization. ET ง 13-708(c). The statute does not, however, supply the standards or guidelines for a court's exercise of the power to grant or withhold authorization.
Even before one reaches the issue of guidelines or standards, the question logically arises whether the withdrawing of artificially administered nutrition and hydration was legislatively intended to be within the "[w]ithdrawing [of] medical or other professional care, counsel, treatment, or service," referred to in ET ง 13-708(b)(8)(iii) and whether that cessation constitutes the "[w]ithdrawing [of] the medical procedure" under ET ง 13-708(c)(3). Although no party or amicus to the present proceedings has raised the issue, it must be addressed because Ronald, as a ward of the court, is entitled to plenary protection of the court. The history of a related enactment, the living will statute, makes clear that care, counsel, treatment, service, and procedure in ง 13-708 include artificial nutrition and hydration.
The living will statute, also called the Life-Sustaining Procedures Act, was enacted by Chapter 620 of the Acts of 1985 "after twelve years of effort." W. Kronmiller, Comment, A Necessary Compromise: The Right to Forego Artificial Nutrition and Hydration Under Maryland's Life-Sustaining Procedures Act, 47 Md.L.Rev. 1188, 1207 (1988). The statute is codified as Md.Code (1982, 1990 Repl.Vol.), งง 5-601 through 5-614 of the Health-General Article (HG). HG ง 5-605 provides, in part, that "[t]he declaration of a qualified patient to withhold or withdraw life-sustaining procedures may not be implemented: (1) [b]y the denial of food, water, or of such medication and medical procedures as are necessary to provide comfort care and to alleviate pain."
In the 1988 opinion, the Attorney General interpreted this provision "to mean that a declaration calling generally for the withholding of life-sustaining procedures may not itself serve as the basis for withholding artificially administered sustenance." 73 Op.Att'y Gen. at 181. That opinion also recognized that foregoing artificially administered sustenance is controversial, in that "[s]ome regard [artificial feeding] as no different in ethical principle than the non-medical means of sustaining life that must always be provided, for to do otherwise would deprive patients of the ordinary care all persons are entitled to receive." Id. at 178. Without joining the ethical or religious doctrine debate, the Attorney General found the legal analysis "clear" and noted that "[e]very appellate court that has addressed the issue has held that there is no difference as a matter of law between artificially administered sustenance and other forms of life-sustaining treatment." Id. at 179.[8] Against the foregoing background, the unqualified language used by the General Assembly in the 1990 amendment of ET ง 13-708(b)(8) and (c) stands in stark contrast. Absent a statutory exclusion of artificially administered sustenance from the medical treatment or procedure referred to in ง 13-708, artificially administered sustenance is included in those terms.[9]
Where court authorization is sought to withdraw from an incompetent person artificially administered sustenance, viewed as a medical treatment, the standard to apply is determined by the right for which judicial protection is sought. The right is one of self-determination, but, if the person who enjoys the right is in a persistent vegetative state, that person cannot make the determination. To protect the right for incompetent persons, and to permit its exercise, courts apply a rule of "substituted judgment."
From the standpoint of initiating a request to withdraw life-sustaining treatment, the judgment of the guardian or applicant for guardianship is truly substituted for that of the ward. But, from the standpoint of whether the treatment is to be withdrawn, the "substituted judgment" label is a misnomer. The judgment of the guardian is not accepted by the court in lieu of the judgment of the ward. Rather, because the right is one of self-determination, the inquiry focuses on whether the ward had determined, or would determine, that treatment should be withdrawn under the circumstances of the case.
In the instant matter, there is no living will that specifically refers to artificially administered sustenance. Cf. 73 Op.Att'y Gen. at 182. Nor did Ronald execute a medical, durable, power of attorney. Cf. id. at 183-84. Accordingly, the inquiry focuses on whether Ronald, while competent, sufficiently had evidenced his views, one way or the other, to enable the court to determine, by clear and convincing evidence, what Ronald's decision would be under the present circumstances. This inquiry is a particular application of a familiar judicial task, that of determining a person's state of mind, based on the evidence, and relating that state of mind to an applicable legal standard. Here, that standard is akin to informed consent.
The scope of the evidence that may be received in the inquiry is as wide as the concepts of relevance and materiality are to the state of mind issue. Oral, as well as written, statements of the ward, made prior to the ward's incompetency, should be considered. Evidence of this character will include any actual, expressed intent or desire to have artificial sustenance withdrawn, but the evidence is not limited to specific, subjective intent evidence. The patient's "`philosophical, religious and moral views, life goals, values about the purpose of life and the way it should be lived, and attitudes toward sickness, medical procedures, suffering and death'" should be explored. Jobes, 529 A.2d at 445 (quoting Newman, Treatment Refusals for the Critically Ill: Proposed Rules for the Family, the Physician and the State, 3 N.Y.L.Sch., Human Rights Annual 45-46 (1985)). These guidelines "should aid in ascertaining [the patient's] desires and in reaching a decision" based upon clear and convincing evidence. Longeway, 549 N.E.2d at 300.
In some cases the evidence will be direct. For example, in McConnell v. Beverly Enterprises-Connecticut, Inc., 209 Conn. 692, 553 A.2d 596 (1989), the patient in a persistent vegetative state was a registered nurse whose last nursing positions were as head nurse and manager of the emergency room at a hospital. "She had, in fact, expressly and repeatedly told her family and her co-workers that, in the event of her permanent total incapacity, she did not want to be kept alive by any artificial means, including life-sustaining feeding tubes." 553 A.2d at 599. Even more forceful is the evidence in In re Severns, 425 A.2d 156, in which the patient who was in a persistent vegetative state had not only expressed her intent not to be kept alive under those circumstances, but she had become "an active member of the Delaware Euthanasia Education Council." Id. at 158. In other cases, the court must make its findings as a matter of inference from all of the evidence. That inference must be closely connected to the clear evidence presented. The patient in Brophy, 398 Mass. 417, 497 N.E.2d 626, was a person who, like Ronald, had been a healthy, robust man who enjoyed outdoor activity. Brophy was stricken by the rupture of an aneurysm, which left him in a persistent vegetative state. The Supreme Judicial Court of Massachusetts sustained the finding of the trial judge who had inferred from all of the evidence that "if presently competent, Brophy would choose to forgo artificial nutrition and hydration by means of a [gastrostomy] tube." 497 N.E.2d at 632. The appellate court collected the factors considered by the trial judge and classified them as including:
"(1) Brophy's expressed preferences; (2) his religious convictions and their relation to refusal of treatment; (3) the impact on his family; (4) the probability of adverse side effects; and (5) the prognosis, both with and without treatment. The judge also considered present and future incompetency as an element which Brophy would consider in his decision-making process."
Id. at 631.[10]
In contrast, the evidence in the instant matter is conflicting. The trial judge found that "[i]f anything, the evidence produces a stalemate." The circuit court was "unable to attribute to any one of [the statements made by Ronald] or all of them a probative value dispositive of the issue, one way or the other, by clear and convincing evidence." These fact-findings are not clearly erroneous. This is a case in which we do not know what decision, if any, the patient had made or would make. Deanna has not met the burden of proof, requiring clear and convincing evidence of Ronald's desire to have the feeding tube removed.

V
Deanna submits that the inquiry should not end where the circuit court left it. She turns back against the Attorney General strong statements from that official's amicus brief:
"The Attorney General correctly observes that [Ronald's] condition for the next thirty or so years is `indeed an appalling' one. He is `utterly without the capacity for self-awareness or awareness of the environment.' The only existence he has is as the `subject of bodily intrusions that ... are humiliating and undignified.' Furthermore, he forces others around him to wait on him and perpetuate his condition. He is condemned to life without hope of improvement and without any sensation of positive value."
Reply Brief of Appellant at 6.
Deanna argues that "[w]hen the direct and indirect indicia of a disabled's intent are unclear, the last resort must be to what a reasonable person in [the patient's] situation would want." Id. at 7. The facts here, she asserts, satisfy that criterion. The term, "best interest," is used to describe the legal test that looks at whether the patient's state of existence is such that a court would conclude that no reasonable person would want existence continued.
A best interest test applied to Ronald or to any patient who is in a persistent vegetative state, who is not in pain, and who is not terminally ill, requires this Court to make a quality-of-life judgment under judicially adopted standards, without any legislative guidelines. There are many reasons why it is not appropriate for this Court to do so.
A best interest argument in the subject context presents a complete shift in the substantive legal justification for a court's action. Best interest is not based on the patient's right of self-determination as to whether treatment should be received or rejected, because the absence of any conclusion as to the patient's judgment on that issue is precedent to applying the best interest analysis.
"The problem with the best-interests test is that it lets another make a determination of a patient's quality of life, thereby undermining the foundation of self-determination and inviolability of the person upon which the right to refuse medical treatment stands."
In re Estate of Longeway, 133 Ill.2d 33, 139 Ill.Dec. 780, 787, 549 N.E.2d 292, 299 (1989). "`One does not exercise another's right of self-determination ... by making a decision which the state, the family, or public opinion would prefer. The surrogate decisionmaker must be confident that he or she can and is voicing the patient's decision.'" In re Guardianship of Browning, 568 So.2d 4, 13 (Fla. 1990) (quoting In re Browning, 543 So.2d 258, 269 (Fla. Dist. Ct. App. 1989)). Contra, see, e.g., In re Guardianship of L.W., 167 Wis.2d 53, 482 N.W.2d 60, 70 (1992). Abandoning the anchorage of the patient's right of self-determination sets courts adrift on a sea of conflicting values and of varying weights to be assigned to those values. Where the values themselves are in a state of flux in society, a legislative body is better equipped to determine, within constitutional limits, whether some lives are not worth living and, if so, how to determine which are the lives that are not worth living.
Nor is this Court prepared to declare, as part of the common law of Maryland, that the feeding of the irreversibly comatose should be stopped, without regard to the patient's desires, on the theory that it is in the best interest of such patients to die. The type of best interest analysis that Deanna urges would require a change in Maryland common law. In Wentzel v. Montgomery Gen. Hosp., Inc., 293 Md. 685, 447 A.2d 1244 (1982), cert. denied, 459 U.S. 1147, 103 S.Ct. 790, 74 L.Ed.2d 995 (1983), we considered an application by co-guardians to have a hysterectomy performed on an incompetent minor ward for the purpose of sterilization. The circuit court's refusal to authorize the surgery was affirmed. As part of the rationale, we said that "in considering the best interests of an incompetent minor, the welfare of society or the convenience or peace of mind of the ward's parents or guardian plays no part." 293 Md. at 704-05, 447 A.2d at 1254. From Ronald's individual standpoint, his needs are met, and he may live for decades. The best interest, i.e., reasonable person, standard that Deanna seeks enlarges the concept of best interest beyond the needs of the ward to include consideration of the emotional and financial impact on, and desires of, Ronald's family and of the burden on the limited resources of society. But we are by no means confident that there exists on this quality-of-life question the degree of societal consensus that this Court ordinarily requires before announcing a change in the common law. See State v. Minster, 302 Md. 240, 245, 486 A.2d 1197, 1199 (1985) (refusing to abrogate "year and a day" bar to murder prosecution because of the "great difference of opinion surrounding the appropriate length of the period").
The preamble to the living will statute also gives pause to effecting so substantial a change by judicial proclamation. In that preamble, the General Assembly declared, inter alia, that the act was "intended to ensure that such basic measures as nursing care, nutrition, and hydration will be maintained out of respect for the human dignity of every patient." 1985 Md. Laws at 2945. Although courts and medical ethicists equate the withholding of artificially administered sustenance to the removal of a respirator, the foregoing legislative declaration indicates that at least a substantial segment of society in this State does not accept that nutrition and hydration should be withheld from a living person who has not personally made that judgment. Methods are available to the Legislature, but not to this Court, for determining what society currently accepts in regard to the administration of artificial sustenance to a patient in a persistent vegetative state.
Further, in the 1988 opinion, the Attorney General commented on the best interest test as follows:
"Patients who are permanently unconscious pose a difficult problem for application of the best interest standard. According to medical experts, someone who is permanently unconscious does not experience suffering, either physically or emotionally. Nor is the person capable of experiencing any of life's satisfactions. The balancing of costs and benefits to the patient that a surrogate must undertake for a terminally ill patient cannot be done in the same way for a patient who is permanently unconscious."
73 Op.Att'y Gen. 162, 189-90 (1988); see In re Peter, 108 N.J. 365, 529 A.2d 419, 425 (1987) ("a benefits-burden analysis ... is essentially impossible with patients in a persistent vegetative state"). After reviewing medical authority supporting, as medically ethical, the withholding of artificially administered sustenance from the permanently comatose patient, the Attorney General concluded:
"Still, we are very reluctant to conclude that the best interest standard, properly applied, takes into account anything other than the patient's actual interest alone."
73 Op.Att'y Gen. at 190. Thus, when the General Assembly returned to the subject of withholding or withdrawing life-sustaining treatment by the 1990 amendments to ET ง 13-708(b)(8) and (c), it is unlikely that the Legislature contemplated that the courts would authorize the withdrawal of artificially administered sustenance to a ward in a persistent vegetative state based on a best interest-reasonable person interpretation of the statute.
Were this Court to conclude that it was not in Ronald's best interest to live, we would be doing much more than simply applying to the facts of Ronald's case a general equitable principle governing decisions concerning a ward of a court. Having concluded that Ronald's individual intent is unknown, a conclusion that it is in Ronald's best interest to die would be based on his existence in a persistent vegetative state. That being the precedent, artificially administered sustenance should be withheld from all persons in a persistent vegetative state whose actual desires concerning the administration of such sustenance are unknown. Examination of that precedent would reveal that persons in a persistent vegetative state have no cognition and cannot take care of themselves. As a logical progression from that precedent, cases eventually would be presented submitting that the best interest of the most severely retarded and feebleminded, who require extended care, who have practically no cognition, and who are too disabled to feed themselves, would be to have sustenance withheld.[11] The question of whether to adopt a quality of life-best interest standard concerns our societal values in a most fundamental sense. The answer to that question is quintessentially legislative.
Unless and until current public policy, as we perceive it, is changed by the General Assembly, sustaining Ronald and other persons like him, whose desires concerning the withdrawal of artificial sustenance cannot clearly be determined, is a price paid for the benefit of living in a society that highly values human life.
JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS TO DETERMINE A GUARDIAN OF THE PERSON FOR RONALD W. MACK. FIFTY PERCENT OF THE COSTS OF THE PARTIES TO BE PAID BY THE APPELLANT AND FIFTY PERCENT BY THE APPELLEES.
Dissenting opinion by McAULIFFE, J., in which MURPHY, C.J., joins.
McAULIFFE, Judge, dissenting.
I agree with the holdings of the Court in Parts I, II, III, and V of the opinion, although not with all of the language employed. I dissent because I disagree with Part IV, and with the result.
The Court and the trial judge pay lip service to the concept of "substituted judgment," but then refuse to apply it in any meaningful way. The Court correctly states that "[t]o protect the right [of self-determination] for incompetent persons, and to permit its exercise, courts apply a rule of `substituted judgment.'" Court's opinion at 214. The Court also correctly notes that substituted judgment does not mean simply substituting the judgment of the guardian for that of the ward. Id. The Court errs, however, in defining the inquiry of substituted judgment to be "whether Ronald, while competent, sufficiently had evidenced his views, one way or the other, to enable the court to determine, by clear and convincing evidence, what Ronald's decision would be under the present circumstances." Id. at 215. That inquiry focuses upon prior statements made by the ward. The substituted judgment approach comes into play when the ward has made no prior statements bearing on the issue, or the statements attributed to the ward do not produce a clear and convincing answer.
The substituted judgment approach that I would apply in this case has been described as "intended to ensure that the surrogate decisionmaker effectuates as much as possible the decision that the incompetent patient would make if he or she were competent." Matter of Jobes, 108 N.J. 394, 529 A.2d 434, 444 (1987). See also Matter of Conroy, 98 N.J. 321, 486 A.2d 1209, 1229 (1985); In re Guardianship of Browning, 568 So.2d 4, 13 (Fla. 1990). The New Jersey Supreme Court explained further:
Under the substituted judgment doctrine, where an incompetent's wishes are not clearly expressed, a surrogate decisionmaker considers the patient's personal value system for guidance. The surrogate considers the patient's prior statements about and reactions to medical issues, and all the facets of the patient's personality that the surrogate is familiar with โ with, of course, particular reference to his or her relevant philosophical, theological, and ethical values โ in order to extrapolate what course of medical treatment the patient would choose.
Matter of Jobes, supra, 529 A.2d at 444 (footnote and citation omitted).
Semantics may be a part of the problem here. "Substituted judgment" is not a particularly apt term โ the very result we wish to avoid is the substitution of someone else's judgment for that of the ward. Rather, the aim is to determine, by reference to all that may be known about the ward, what decision he or she would make if presently competent and possessed of complete information concerning all relevant factors. "Constructed individual judgment" comes to mind as a possibly more appropriate term, but I suspect that combination of words has its own limitations.
Substituted judgment should not be viewed as something separate and distinct from the inquiries concerning the ward's prior statements or formal written declarations evidencing intent. The question in cases such as this is what the ward would wish done under the present circumstances. An explicit written direction, validly made when competent, and not otherwise suspect, may furnish the complete answer. Absent such a document, previous oral declarations may be sufficient to afford clear and convincing evidence of the ward's intentions. When prior statements alone do not provide the requisite evidence of intent, those seeking to ascertain the wishes of the ward should add to the relevant considerations all that is known about the ward and his condition and prognosis, and determine from that full body of information whether the intent of the ward may be ascertained with the necessary level of confidence.
Those who seek to ascertain the wishes of the ward will not necessarily be judges. Decisions of this kind are often made by the immediate members of the patient's family, in conference with attending physicians who act in accordance with the ethical standards of their profession and, where appropriate, in accordance with the standards established by an involved hospital and its designated committee. I agree with the Attorney General's warning that "[t]he Court should be especially cautious about casting a pall of legal uncertainty over established practices in the clinical setting, where doctors and patients' families together often make these excruciatingly difficult decisions about life-sustaining medical treatment." Brief of State of Maryland as Amicus Curiae at 15. In the instant case, however, where family members do not agree, and when the question is presented as the appropriate decision to be made by a court-appointed guardian, court intervention is clearly required. See Maryland Code (1974, 1991 Repl.Vol.) ง 13-708(c) of the Estates and Trusts Article.
A trial judge's inquiry when applying the substituted judgment approach is necessarily broad in scope. As the New Jersey Supreme Court pointed out in Matter of Conroy, supra, 486 A.2d at 1230, "all evidence tending to demonstrate a person's intent with respect to medical treatment should properly be considered...." In the words of the Attorney General of Maryland, "[t]he task is like assembling a mosaic from the tesserae of the person's life." State's Brief at 19. Factors to be considered include, but are not limited to: evidence of the ward's views about life-sustaining medical treatment, in light of the ward's diagnosis and prognosis; the ward's reaction to medical treatment of others; the ward's religious beliefs and personal moral values; the ward's attitudes concerning doctors, hospitals, and nursing homes and any prior experiences with the health care system; and, most broadly, the ward's value system. The question we thereby attempt to answer may be stated in this hypothetical form: If Ronald Mack, complete with his personality, predilections, philosophies, beliefs, and values were given competency for a day, and fully informed concerning what had transpired, the condition and environment to which he would shortly and permanently return, the beliefs and desires of his family members, and the prognosis in his case, what decision would he make concerning the discontinuance of artificially administered nutrition and hydration?
After studying the trial judge's opinion in this case, I am not at all certain that he considered all the factors relevant to a substituted judgment analysis. Perhaps of greater concern to me is the Court's opinion, which affirms the trial judge by not requiring the inquiry which I believe is inherent in the substituted judgment approach, and which should be required here.
According to the well-documented findings of the trial judge, Ronald Mack exists in a persistent vegetative state. He has been in that state for nine years and he will never recover. He is "alive" in the legal sense, because his brain stem is intact and permits vegetative functions. He exists only because of "the advance of medical technology capable of sustaining life well past the point where natural forces would have brought certain death in earlier times...." Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 270, 110 S.Ct. 2841, 2847, 111 L.Ed.2d 224 (1990). He is permanently and irreversibly unconscious. He cannot eat, drink, or cough. He has no cognitive ability โ he cannot see, hear, speak, touch, or think. He has no feeling or sensation of pain or pleasure. He is incapable of experiencing joy, love, hate, or emotion of any kind. He is emaciated, his hands are clenched, and his limbs are bent and rigid. He has a tracheostomy to permit suctioning of lung secretions, and a surgically implanted gastrostomy tube to permit introduction of nutrients directly into the stomach. He has no control of bladder or bowels. He suffers recurrent seizures and skin rashes. He has heightened physical reflexes, without awareness, and on one occasion nearly bit off his bottom lip.
With the quality nursing care that is currently being given Ronald by the Veteran's Administration, life in this form may continue for 30 to 40 years. If the gastrostomy tube is removed and no other artificial feeding is initiated, death will occur, without appreciation of pain or discomfort, in seven to fourteen days.
Ronald's condition is permanent and irreversible. No one has ever recovered after having been in a persistent vegetative state for at least two years. See Cruzan, supra, 497 U.S. at 309, n. 8, 110 S.Ct. at 2868, n. 8 (Brennan, J., dissenting) (citing Snyder, Cranford, Rubens, Bundlie, & Rockswold, Delayed Recovery from Postanoxic Persistent Vegetative State, 14 Annals Neurol. 156 (1983)). There is no reasonable hope of a cure or remission to be brought about by anticipated advances in medical science during Ronald's life expectancy.
Given these facts alone, I believe most reasonable persons would elect to terminate this existence. As Justice Scalia noted in his concurring opinion in Cruzan, society is faced with "the constantly increasing power of science to keep the human body alive for longer than any reasonable person would want to inhabit it."[1] 497 U.S. at 292, 110 S.Ct. at 2859. In the absence of evidence to the contrary, one may certainly infer that Ronald would share that view. There is little, if any, evidence that I see in the record to suggest that he would not. When that common sense consideration is added to the mix of relevant factors, the usual result will be a determination in favor of withdrawing artificial nutrition. If, however, the evidence shows that the ward harbored religious, philosophical, or other beliefs in favor of the preservation of "life" at all costs, no matter how barren and hopeless, the result would be different. And, because the ward, if competent, would surely consider the desires and feelings of his family, those factors would have to be considered, and might produce a contrary result.
Each individual is different. Careful and painstaking consideration must be given to the relevant facts of the ward's life, personality, and condition before any attempt is made to determine what the ward would have decided in those circumstances. I wish to emphasize, however, my strong belief that it is not only permissible, but indeed necessary, to attribute to the ward the inclination or desire of an ordinary, prudent person under the same circumstances, unless and until there is evidence that he or she would not have shared those views, and to give that factor the heavy weight it deserves in a case such as this.
As I read the Court's opinion, a trial judge's inquiry is essentially limited to an attempt to determine the intent the ward may have formed when competent.[2] Thus, even if those members of Ronald's family who now object to the withholding of artificially administered nutrition and hydration had instead joined with the wife in requesting court approval of that action, the trial judge would have been powerless to grant it because of his inability to find clear and convincing evidence of Ronald's prior intent. I strongly disagree. I would vacate the judgment and remand to the trial court for further proceedings employing the substituted judgment approach.
MURPHY, C.J., joins in this opinion.
CHASANOW, Judge, concurring and dissenting opinion.

I. THE GUARDIANSHIP DECISION
I believe the majority's opinion fails to take into consideration some of the factual background that was the basis for the trial judge's guardianship decision. The majority also fails to take into consideration two basic legal principles: 1) when a trial judge sits without a jury, an appellate court will not set aside the trial court's judgment on the evidence unless it was clearly erroneous, Maryland Rule 8-131(c); and 2) a trial judge's choice of guardian of the person will not be reversed absent an abuse of discretion. Kicherer v. Kicherer, 285 Md. 114, 119, 400 A.2d 1097, 1101 (1979). The trial judge, Fader, J., made a carefully considered, very difficult decision. He was not clearly erroneous and did not abuse his discretion.
In reviewing whether a trial court was clearly erroneous in rendering its decision, this Court must view the facts and all reasonable inferences in the light most favorable to the prevailing party. A trial court's decision will not be clearly erroneous where there was substantial evidence on the record to support the trial judge's decision. I.W. Berman Prop. v. Porter Bros., 276 Md. 1, 12, 344 A.2d 65, 72 (1975). To put the trial court's decision in perspective, we must examine the earlier federal litigation that engendered the instant suit.
In 1985, the Veterans Administration (V.A.) contacted Deanna Mack, who was then living in Florida, and inquired whether she wished to have her husband Ronald transferred from Maryland to a V.A. hospital in Florida. She declined to authorize the transfer. In a conversation with a nurse several years later, Deanna learned that by virtue of her Florida "plenary" guardianship, she might be able to order that Ronald's nutrition and hydration tube (the gastrostomy tube) be removed even without court approval if Ronald were hospitalized in Florida. Deanna contacted a Florida attorney who apparently advised her that the preferable course of action would be to have Ronald transferred to Florida and to secure a Florida court order authorizing the V.A. to remove the gastrostomy tube. Deanna, through counsel, filed a petition in Florida to remove the gastrostomy tube and simultaneously filed a request in Maryland that the V.A. release Ronald to her for transfer to a V.A. hospital in Florida.
Apparently, the only way that Ronald's father, Ronald W. Mack (whom, in deference to his seniority, I will refer to as Mr. Mack), could stop the V.A. from releasing Ronald for transfer to Florida, and to his certain death, was to seek an injunction. Mr. Mack filed suit in the United States District Court for the District of Maryland seeking to enjoin Ronald's transfer to Florida. The District Court, Garbis, J., recognized that if Deanna were Ronald's guardian, then the V.A. would have to comply with her request to release Ronald to her for transfer to Florida where she resides. Judge Garbis further recognized that, once Ronald was in Florida, Deanna would proceed with her litigation to have the gastrostomy tube removed. If, however, Mr. Mack were Ronald's guardian, then the V.A. would abide by his wishes regarding whether Florida's or Maryland's V.A. hospital would care for Ronald.
In his Memorandum Decision, Judge Garbis noted that "V.A. counsel acknowledged that there is a question regarding the status of Deanna V. Mack as guardian. Therefore, until her status is clarified to the satisfaction of the V.A., [Ronald] will not be released to her custody. However, if the V.A. were to be satisfied that Deanna V. Mack was, in fact, [Ronald's] guardian, it would comply with her demand." Judge Garbis issued a preliminary injunction enjoining Ronald's transfer to Florida pending a determination in a state court as to "whether Deanna V. Mack is, in fact, the duly authorized guardian of the person of Ronald W. Mack."
Deanna and Mr. Mack filed the instant guardianship petitions in compliance with Judge Garbis' request that the parties expeditiously obtain a state court determination as to who is the guardian of Ronald's person. That determination would then resolve the issue of whether the injunction against Ronald's transfer to Florida would remain in effect or be terminated.
Judge Fader in his carefully crafted opinion noted:
"This case came to the Circuit Court for Baltimore County as a result of a Temporary Injunction issued by The Honorable Marvin J. Garbis, Associate Judge of the United States District Court for Maryland, Civil Action, MJG-91-1314, dated May 30, 1991, forbidding the Fort Howard Veterans Administration Hospital from discharging Ronald W. Mack from that hospital, except upon order of court which temporary injunction, in effect, left it to this court to decide the underlying issue of guardianship.[52] Judge Garbis issued his order, upon the Complaint of Ronald's father and sister, when Deanna V. Mack stated her intention to the Fort Howard Hospital personnel that she wanted to take her husband back to Florida for the purpose of withdrawing his life-sustaining medical treatment, i.e., the administration of artificial nutrition and hydration.
[52] A copy of the decision and temporary injunction issued by Judge Garbis is a part of the court file."
The undisputed testimony from Deanna, as well as the report of the guardian ad litem, established that if Ronald were transferred to Florida, Deanna intended to and would be able to secure a court order to remove Ronald's gastrostomy tube. It was reasonable for Judge Fader to conclude that if Deanna were appointed guardian, the preliminary injunction would probably be lifted and Ronald would be transferred to Florida. The V.A. had already stated that if Deanna were Ronald's guardian it would comply with her demand.[1] Once Ronald was in Florida, Deanna would be able to have his gastrostomy tube removed.
I submit that the trial judge did not abuse his discretion in ultimately appointing Mr. Mack the guardian of Ronald's person. Maryland Code (1974, 1991 Repl.Vol.), Estates and Trusts Article, ง 13-707(a) provides that when a court appoints a guardian, spouses are entitled to a higher priority than parents; however, "for good cause, the court may pass over a person with priority and appoint a person with a lower priority." Estates and Trusts Art., ง 13-707(c)(1). The determination of whether "good cause" exists is purely within the discretion of the court. See Kicherer, 285 Md. at 119, 400 A.2d at 1101. Thus, the standard of review of the Court's determination is whether the court below abused its discretion in finding good cause to bypass Deanna Mack and appoint Mr. Mack as guardian. See id. Even the majority agrees with the trial judge that Deanna's views with regard to removing the gastrostomy tube are "a factor in an overall determination." 329 Md. 188, 206, 618 A.2d 744, 753 (1993). This Court, nevertheless, reverses Judge Fader because it believes he treated Deanna's "views" as the sole factor in awarding guardianship and "decided the issue by treating Deanna as disqualified...." Id. at 206, 618 A.2d at 753. Judge Fader did no such thing; he determined guardianship based primarily on the issue that all parties recognized was the overriding issue in this case. The evidence not only permits, but compels, the conclusion that Deanna was seeking this Maryland guardianship of the person over Ronald for one predominant, if not sole purpose โ to have Ronald's gastrostomy tube removed. The trial judge's decision was not based on Deanna's "views" about removing Ronald's gastrostomy tube โ the decision was based on Deanna's intent to remove Ronald's gastrostomy tube, and her apparent ability to carry out that intent if she were appointed guardian. The trial court as well as this Court have decided Ronald should remain on artificial life support. If Deanna were appointed guardian, it is reasonable to assume the V.A. would transfer Ronald to her home state, Florida, where Deanna's "views" would be Ronald's fate. Judge Fader did not abuse his discretion in addressing this as the predominant reason for denying Deanna's guardianship.
The majority also reverses the trial judge for not addressing the other factors bearing on the issue of guardianship. Specifically, it complains that "there was no finding whether Deanna could or would fulfill the duties of guardian. There was no finding on Ronald, pere's, contention that his geographical proximity to Ronald weighted the best interest scale in favor of appointing the father as guardian." Id. at 204, 618 A.2d at 752 (footnote omitted). I submit these remaining issues did not need to be further addressed by the trial judge because, as a matter of law, they could only favor Mr. Mack, rather than Deanna. In fact and in law, the issue of geographical proximity favors Mr. Mack. Mr. Mack lived close by and visited Ronald approximately once a week. Deanna has moved to Florida, approximately 1,000 miles away from Ronald, and she acknowledges that over the last few years she was only able to visit Ronald once or twice a year. As to geographical proximity, the majority acknowledges that, as a matter of law, "appointment of a resident is preferred." Id. at 204 n. 3, 618 A.2d at 752 n. 3. Indeed, the majority opinion cites two cases for that proposition: Rosin v. United California Bank, 226 Cal. App.2d 166, 37 Cal. Rptr. 830, 833-34 (1964); In re Boutz' Guardianship, 24 Cal. App.2d 644, 76 P.2d 154, 157 (1938). Both of these cases cited by the majority contain the following statement:
"`While in the absence of statutory provisions to the contrary, a nonresident may be appointed guardian, such appointments are not favored, the rule being that a resident should be appointed rather than a nonresident, unless some very strong reason for appointing the latter is made to appear.'"
Rosin, 37 Cal. Rptr. at 833 (quoting Boutz, 76 P.2d at 157).
With respect to Deanna's ability to fulfill the duties of guardianship, prior to seeking this reappointment as Maryland guardian Deanna had demonstrated no interest in performing most of the duties usually associated with guardianship of a person. Approximately seven years ago, Deanna, at her own request, was removed as the Maryland guardian of Ronald's person, and Mr. Mack acted as Ronald's caretaker, if not his legal guardian since that time. It was Mr. Mack, not Deanna, who remained close to Ronald. It was Mr. Mack who, after Deanna renounced her prior Maryland guardianship, supervised Ronald's medical treatment, visited regularly, and provided the attention, kindness, and affection that a guardian should provide. Deanna moved away from Ronald and, for over a half-dozen years, lived with and had a child by another man. Seven years ago, she resisted V.A. efforts to have Ronald transferred to the state where she lives. Her contacts with Ronald were minimal over the last few years and her visits dwindled to approximately one per year. The only way Deanna could be in a position to effectively supervise Ronald's care would be if Ronald were moved to Florida, and it was undisputed that if Ronald were moved to Florida, the care and treatment he would get there would be removal of his gastrostomy tube.
In light of the evidence adduced at trial and the trial judge's authority under ง 13-707(c)(1) of the Estates and Trusts Article to reorder the statutory priorities, I do not understand how the majority can hold that the trial judge abused his discretion in appointing Mr. Mack guardian of the person of his son. There is no need to remand the case and no need for Judge Fader to further address the "issues" of geographical proximity and ability to fulfill the duties of guardian.

II. PERSISTENT VEGETATIVE STATE
The majority begins its analysis of when a court may authorize withdrawal of nutrition and hydration in the same manner as most modern cases. There is a common law right, and perhaps a state and federal constitutional right, of both competent as well as incompetent patients to refuse life-sustaining medical treatment. There must be clear and convincing evidence to justify withdrawal of life-sustaining medical treatment. Artificially administered nutrition and hydration is a form of life-sustaining medical treatment and "court decisions dealing with withdrawing artificially administered nutrition and hydration from a patient who is in a persistent vegetative state analogize the legality of the withdrawal to the cessation of medical treatment for a terminally ill patient." 329 Md. at 205, 618 A.2d at 753. I concur in these portions of the majority opinion, assuming the term "persistent vegetative state" includes only those patients who are in an irreversible vegetative state.
The majority then establishes a test for whether Ronald's gastrostomy tube may be removed, stating:
"the inquiry focuses on whether Ronald, while competent, sufficiently had evidenced his views, one way or the other, to enable the court to determine, by clear and convincing evidence, what Ronald's decision would be under the present circumstances."
329 Md. at 215, 618 A.2d at 757-58. I have two problems with the majority's test. First, I doubt that very many healthy, robust young people, like Ronald was, ever seriously consider that they may someday be in an accident and be reduced to a persistent vegetative state. Even if some did contemplate such a horrible event, how many would have clearly and convincingly formed and evidenced their views that, if in a persistent vegetative state, they would at some point choose to terminate artificial life support or, alternatively, that they would choose to remain in that state until they die of "old age." My second major objection is that, based on the majority's test, infants and other patients who have never been competent and are in a persistent vegetative state may be forever denied court authorization to terminate life-sustaining medical treatment because they did not evidence and could not have evidenced their views not to be indefinitely maintained on life support systems.
The majority states "sustaining Ronald and other persons like him, whose desires concerning the withdrawal of artificial sustenance cannot clearly be determined, is a price paid for the benefit of living in a society that highly values human life." 329 Md. at 222, 618 A.2d at 761. This statement, though evocative, is not cogent since it is doubtful that society "highly values" life in a persistent vegetative state. As one author noted:
"In 1976, the New Jersey Supreme Court held that a parent of Karen Quinlan, a young woman in a permanent vegetative state, could authorize removal of a respirator that was keeping Karen biologically alive. Since then, public opinion polls have revealed an impressive shift of opinion in just one generation from a majority opposed to `pulling the plug' on permanently comatose patients to a large majority โ sometimes nearing 90% โ in favor of such measures." (Footnotes omitted).
S. Kadish, Letting Patients Die: Legal and Moral Reflections, 80 Cal.L.Rev. 857, 860 (1992).
Medical ethics would permit the withholding of life-sustaining medical treatment for patients in a persistent vegetative state. According to Dr. Timothy James Keay in his amicus curiae brief, the textbook Clinical Ethics has been used for the mandatory course in medical ethics at the University of Maryland School of Medicine for the last four years. That textbook states:
"(1) We propose that the state of an irreversible loss of human cognitive and communicative function implies that a `person' no longer exists in any significant sense of the term. This individual is no longer aware of self in relation to surroundings and never will be again. In our terms life has fallen irretrievably below the threshold considered minimal. (2) As a result, no goals of medicine other than support of organic life are being or will be accomplished. We do not believe this goal, in and of itself, is an independent and overriding goal of medicine. (3) Furthermore, it is difficult to know what `benefit' might mean when the patient now, and never will, be able to appreciate what is being done for him or her. (4) No preferences of the patient are expressed or known. The conjunction of these four factors justifies, in our judgment, a decision not to continue medical intervention โ that is, physicians have no ethical obligation to continue treatment. Since it is the duty of physicians to benefit their patients, in the absence of benefit, there is no duty to treat. The same argument does not, in and of itself, justify active euthanasia."
A. Jonsen et al., Clinical Ethics: A Practical Approach to Ethical Decisions in Clinical Medicine at 106-07 (2d ed. 1986).
I do not mean to suggest that we ought to presume that people in a persistent vegetative state would choose not to have their existence maintained by artificial nutrition and hydration. I do suggest that, even though the patient did not or could not clearly and convincingly evidence any views on the subject, the patient's family, absent any suggestion of improper motives, should be able to secure court approval to have life support terminated where the family believes that would be what the patient would choose if able to express a choice.
The majority holds that Judge Fader was correct in ruling that Ronald's gastrostomy tube should not be removed. The majority's sole consideration was that Ronald had never clearly and convincingly evidenced his views. I submit that Judge Fader was correct in ruling that Ronald's gastrostomy tube should not be removed because 1) Ronald had never clearly evidenced his views on the subject and 2) the two family members closest to him differed in their sincere beliefs as to what Ronald would have wanted. Therefore, Judge Fader could conclude there was no clear and convincing evidence as to what Ronald would have wanted regarding removal of the gastrostomy tube.

III. COURT INTERVENTION IN THE DECISION TO TERMINATE LIFE SUPPORT
This is a guardianship case. Pursuant to Maryland Code (1974, 1991 Repl.Vol.), Estates and Trusts Art., ง 13-708(c), where there is a guardianship the court must authorize withdrawing medical procedures which would involve a substantial risk to the life of the disabled person. The majority appropriately points out:
"We emphasize that this case does not deal with a terminally ill patient[[2]] who has neither a living will nor a durable power of attorney, who has no guardian, and whose family and health care providers are in agreement about the use or discontinuance of life-sustaining measures." (Footnote added).
329 Md. at 204 n. 4, 618 A.2d at 752 n. 4.
Where an incompetent patient is in a persistent vegetative state or is terminally ill and there is no designated guardian, then those closest to the patient, if unanimous, should be able to make the decision to terminate life support without judicial intervention. The courts are less suited than the patient's loved ones, acting with concurrence of the patient's physicians, to make these decisions. Most authorities agree that there is no need for judicial approval if there is a unanimous decision by those closest to the patient and the patient's health care providers that life support should be terminated. See, e.g., State Justice Institute, Guidelines for State Court Decision Making in Life-Sustaining Medical Treatment Cases Guideline 3, at 36-37 (2d ed. 1992) (trial court should decline jurisdiction unless it finds parties are not in agreement as to patient's actual or probable wishes); American Bar Association, Standards Relating To Trial Courts ง 2.73.5, at 122-23 (1992) ("Disputes regarding a decision to forgo, continue, or withdraw life-sustaining medical treatment (LSMT) preferably should be resolved without court involvement," and the commentary to that standard indicates "[m]ost LSMT decisions are made by the patient or the patient's family and the health care provider without recourse to the courts."); M. Yuen, Comment, Letting Daddy Die: Adopting New Standards for Surrogate Decisionmaking, 39 UCLA L.Rev. 581, 600 (1992) ("Although several courts initially suggested that the judicial system was the appropriate forum to decide whether life-sustaining treatment could be withdrawn from an incompetent patient, courts have more recently declined to require judicial intervention as a prerequisite to [the family and attending physicians] making such decisions." (Footnote omitted)); K. Opperman, Note, Termination of Life-Sustaining Treatment: Who and How to Decide?, 33 N.Y.L.Sch.L.Rev. 469, 479 (1988) ("Most treatment decisions for the incompetent patient are highly private decisions made by family and physicians who follow the termination of life-sustaining treatment guidelines of the institution where they practice. Logically, if all parties are acting in good faith, this is where treatment decisions should remain." (Footnotes omitted.)); see also Conservatorship of Morrison, 206 Cal. App.3d 304, 312, 523 Cal. Rptr. 530, 535 (1988) ("Judicial intervention in `right-to-die' cases should be minimal.... [C]ourts should intervene only if there is disagreement among the conservator and other interested parties and they have exhausted all nonjudicial efforts to resolve the dispute." (Emphasis in original)); Conservatorship of Drabick, 200 Cal. App.3d 185, 198, 245 Cal. Rptr. 840, 847 ("Patients make their own treatment decisions with the advice of their physicians. Family members, and sometimes other persons, participate when the patients cannot. Courts, on the other hand, become involved only when ... there are disagreements."), cert. denied, 488 U.S. 958, 109 S.Ct. 399, 102 L.Ed.2d 387 (1988); In re L.H.R., 253 Ga. 439, 321 S.E.2d 716, 722-23 (1984) (hospital was required to remove life supports from infant in vegetative state per wishes of parent and guardian ad litem); Matter of Lawrance, 579 N.E.2d 32, 41-43 (Ind. 1991) (Parents were permitted, without court approval, to withdraw nutrition and hydration from a never-competent patient in a persistent vegetative state. The court stressed that judicial intervention is not appropriate when physicians and family members are in agreement, and noted that medical ethics and professional regulations provide safeguards against any abuse.); Matter of Jobes, 108 N.J. 394, 529 A.2d 434, 451 ("If a disagreement arises among the patient, family, guardian, or doctors, or if there is evidence of improper motives or malpractice, judicial intervention will be required. We expect, however, that disagreements will be rare and that intervention seldom will be necessary."), stay denied, 483 U.S. 1036, 108 S.Ct. 6, 97 L.Ed.2d 796 (1987). Jobes cites surveys that strongly support the desirability of family members making medical decisions for incompetent persons. It concludes that "[e]very recent survey that we have found indicates that society believes that a patient's family members should function as his or her surrogate decisionmakers." Jobes, 529 A.2d at 446 n. 11.
There is, of course, the danger that uncaring selfish family members will be motivated by a desire to get rid of incompetent relatives who are unwanted and burdensome. The safeguard in this situation will be that health care providers probably will not concur and should require court approval if they believe the family is not really acting in good faith and in accord with the patient's probable views. In addition, Maryland statutes require all hospitals to have Patient Care Advisory Committees, sometimes called "Ethics Committees." Md.Code (1982, 1990 Repl.Vol., 1992 Cum.Supp.), Health-General Art., งง 19-370 to 19-374. The committees have, at a minimum, one physician and one nurse, neither of whom is directly involved with the patient's care, as well as one administrator and one social worker. These committees could review a family's request to withdraw life-sustaining medical treatments for a patient if there is any question about whether the request is appropriate or made in bad faith.
As long as there is no guardian appointed, the great weight of authority holds that there is no need for judicial approval for decisions to terminate life support of an incompetent patient who is terminally ill or in a persistent vegetative state when the family and the health care providers are in agreement on the decision. The obvious reason for permitting those closest to the patient to make this decision is that they are in the best position to determine what the patient would have chosen if the patient were able to make the choice. Since the unanimous opinion of those closest to the patient is almost universally accepted as the basis for a decision to terminate an incompetent patient's treatment when there is no guardian, the same criteria should be used by the court as a basis for a decision to terminate an incompetent patient's treatment where there is a guardian.

IV. SURROGATE JUDGMENT
There should be a hierarchy in the evidence which would clearly and convincingly justify withdrawal of life support: 1) a living will or a durable power of attorney delegating the decision; 2) statements of the patient to other people concerning the patient's views about life support; 3) the opinions of spouses, parents, siblings, other family members, and very close friends as to what the patient's choice would be. These people would be in the best position to assess the patient's views; in fact, these people would probably have molded, shaped, or influenced the patient's views. Any one of the above three types of evidence could constitute clear and convincing evidence. There is also a fourth category which would include the patient's attitude toward medical treatment, ethical, religious, and moral views, life goals, etc. I rather doubt that evidence in the fourth category could alone constitute clear and convincing proof of a patient's choice, but it could support one of the other three.
The majority discusses at some length the type of evidence which could be used to determine whether an incompetent patient had clearly and convincingly evidenced his or her views that treatment should be withdrawn. The kinds of evidence the majority suggests a court might use could include the patient's philosophical, religious, and moral views, life goals and values, attitude toward medical treatment, etc. As indicated, these factors are helpful, but it seems doubtful that, in the absence of express statements by the patient, many judges would hold that a patient's views, attitudes, and goals alone could clearly and convincingly establish the patient's choice about terminating life support. The majority fails to mention what I believe is the most probative and compelling evidence other than express statements by the patient. That evidence is the opinions of those closest to the patient about what the patient would have chosen under the present circumstances.
Ordinarily courts are reluctant to receive opinions on a factual issue; however, the inquiry at issue is not factual. It is an attempt to predict a choice that cannot be made. Ultimately, the decision will turn on the court's own opinion of what the incompetent patient would have chosen if able to choose. The beliefs and opinions of close family members should be of substantial assistance to the court. It is generally recognized that lay opinions ought to be admitted if they would aid the trier of fact. See J.W. Strong et al., McCormick on Evidence ง 11 (4th ed. 1992). In analogous situations, we allow close family members to give lay witness opinions concerning a person's mental capacity to make a valid will or contract. See 6 L. McLain, Maryland Evidence ง 701.3 (1987). Close family members may never remember all the conversations they had with the patient that would be relevant to predicting the patient's choice. They can, however, remember general impressions about the patient's attitudes and beliefs, as well as enough specific information to enable the court to assess the validity of their opinions. If the ultimate determination is to be an opinion about what the incompetent patient would have chosen, a judge who never knew the patient should be guided by the opinions of the patient's loved ones who best knew the patient.
Absent an express prior decision by the now incompetent patient, there should be a surrogate effort to determine and carry out the choice this patient would have made if able to make the choice. Even with infants and people who have never been competent, decisions about what they would have chosen, if competent, can be made based on the opinions of parents and other close family members. It is reasonable to assume that an infant or incompetent child, if capable of rendering a decision, would reflect the values and views of parents and close family members. These people, unless their motives are suspect, ought to be able, as surrogate decision makers, to opine about what decision the patient would make if able to make that decision.
Many courts have held that the decision to terminate life support systems should be based on the opinions of family members, as to what the patient would have chosen. For instance, in Matter of Spring, 380 Mass. 629, 405 N.E.2d 115 (1980), the Supreme Court of Massachusetts approved an order terminating life support for a seventy-nine year old senile incompetent patient with kidney disease. There was no evidence that the patient had, while competent, expressed any views about withdrawal of life support treatment, but the court accepted the opinions of the patient's wife and son that, if competent, the patient would want treatment withdrawn. The court stated that "[t]he wife and son had only the best interests of the ward at heart, and that they were best informed as to his likely attitude." Id., 405 N.E.2d at 122; see also John F. Kennedy Memorial Hosp. v. Bludworth, 452 So.2d 921, 926 (Fla. 1984) ("close family members or legal guardians substitute their judgment for what they believe the terminally ill incompetent persons, if competent, would have done under these circumstances").
In Matter of Jobes, 108 N.J. 394, 529 A.2d 434 (1987), the Supreme Court of New Jersey approved what I would call surrogate judgment, which it described as follows:
"This approach is intended to ensure that the surrogate decisionmaker effectuates as much as possible the decision that the incompetent patient would make if he or she were competent. Under the substituted judgment doctrine, where an incompetent's wishes are not clearly expressed, a surrogate decisionmaker considers the patient's personal value system for guidance. The surrogate considers the patient's prior statements about and reactions to medical issues, and all the facets of the patient's personality that the surrogate is familiar with โ with, of course, particular reference to his or her relevant philosophical, theological, and ethical values โ in order to extrapolate what course of medical treatment the patient would choose.
* * * * * *
Family members are best qualified to make substituted judgments for incompetent patients not only because of their peculiar grasp of the patient's approach to life, but also because of their special bonds with him or her." (Footnotes omitted).
Id., 529 A.2d at 444-45.
Even where the patient has never been competent, courts have held that a determination can still be made, usually relying on the opinions of the patient's family, as to what the patient probably would have chosen. For example, the court in Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417, 431-32 (1977), determined that where a patient had been severely retarded his entire life, the court could still determine that the patient would choose not to undergo potentially life saving chemotherapy. Courts have also permitted parents to speak on behalf of their infant children, who have never had the opportunity to develop or express their own views. See In re L.H.R., 253 Ga. 439, 321 S.E.2d at 722 (Patient was an infant in a chronic vegetative state. Court held that parents could make the decision to terminate life support and stated: "The right of the parent to speak for the minor child is so imbedded in our tradition and common law that it has been suggested that the constitution requires that the state respect the parent's decision in some areas."); Guardianship of Barry, 445 So.2d 365, 371 (Fla.App. 1984) (Parents petitioned court for approval to terminate life support system for their 10-month-old child who was terminally ill and in a chronic permanent vegetative coma. Court held parents may, even without court approval, make the decision, based on their substituted judgment, to remove child's life support system.); Care & Protection of Beth, 412 Mass. 188, 587 N.E.2d 1377 (1992) (1992) (upheld finding that infant in an irreversible coma would choose to refuse resuscitation).
The bottom line is this: Does the surrogate decision maker believe and have an adequate basis for believing that this patient, if suddenly and miraculously given the ability to express a preference, would choose to terminate life support? The surrogate decision maker should be the patient's family or loved ones who know the patient best, subject to court ratification in a guardianship case or court resolution where there is a dispute among close family members. Where the patient has not clearly and convincingly evidenced, or was unable to evidence, any view, courts should consider the good faith opinions of those closest to the patient about what the patient would have chosen.
There is obvious and well-founded criticism for using surrogate judgment in trying to determine what a person who is incapable of making a decision would have decided if capable of making the decision. See, e.g., L. Harmon, Falling Off the Vine: Legal Fictions and the Doctrine of Substituted Judgment, 100 Yale L.J. 1 (1990). I still believe it is better to attempt to replicate the decision the incompetent would have made, if able to decide, by using whatever information we may glean about the incompetent's thought processes and by giving great deference to the opinions of those closest to the incompetent.
The alternative approach suggested by the majority is that the legislature develop objective standards and criteria as to which patients will and which patients will not be continued on life support.[3] Admittedly family members of an incompetent patient who has never been competent may have minimal insight into or means of identifying the patient's wishes and desires, but their insight is still better and more individualized than purely objective criteria established by a legislature or a court. It goes without saying that there is probably wide divergence of opinion among legislators and judges about when it would be more desirable to die than to live. If a decision is to be made, then the patient's probable decision can best be determined by those closest to the patient rather than by a legislature or a judge. Professor Nancy K. Rhoden in her article Litigating Life and Death, 102 Harv.L.Rev. 375 (1988), stated the reasons why the decision to terminate life support should be made by the family.
"Not surprisingly, polls repeatedly show that patients, and members of society in general, believe that family members should function as surrogate decisionmakers. In short, there is a deep-rooted and almost instinctual sense that a close family member should make such decisions. Most readers will understand this if they consider whom they would want to make treatment decisions for themselves โ their families or physicians and hospital administrators.
Moreover, because of the nature of the family as an association, its members are in the best position to reproduce the preferences of an incompetent patient. Numerous courts and commentators have emphasized that family members are best qualified to make these decisions, because of their knowledge of the patient's likely preferences and their special bonds with the patient. Not only are family members most likely to be privy to any relevant statements that patients have made on topics of treatment or its termination, but they also have longstanding knowledge of the patient's character traits. Although evidence of character traits may seem inconclusive to third parties, closely related persons may, quite legitimately, `just know' what the patient would want in a way that transcends purely logical evidence. Longstanding knowledge, love, and intimacy make family members the best candidates for implementing the patient's probable wishes and upholding her values." (Footnotes omitted).
Id. at 437-38.
Another reason why a patient's loved ones are best able to make the decision that the incompetent patient would want made is that the choice most people would want made, should they become incompetent, would be whatever their loved ones would choose on their behalf. For example, a poll published in the National Law Journal found:
"An overwhelming 88 percent of Americans say the family should decide whether to end artificial life support when an individual is in a coma without hope of recovery and has left no instructions on personal wishes. Only 8 percent said doctors should make the decision; 1 percent said the courts should decide, and no one selected the state."
M. Coyle, How Americans View High Court, Nat'l L.J., Feb. 26, 1990, at 1, 36 (citing National Law Journal/Lexis poll of over 800 people which had a statistical margin of error of plus or minus 3.4%).
The decision to terminate life support should ideally be the patient's. If the patient has never made and is not capable of making the decision, there is no easy choice or good alternative, but the better of a poor choice of alternatives seems to be using the legal fiction of attempting to determine what this patient would have desired, relying primarily on the opinions of the patient's loved ones who know the patient best. This is preferable to using objective criteria set by a court or legislature or using only the opinion of a judge who never knew the patient whose life is at issue.

V. LEGISLATION
The majority makes the fitting suggestion that legislative guidelines would be helpful in this difficult area. I do not, however, subscribe to the passive euthanasia implication of the majority's statement that "a legislative body is better equipped to determine, within constitutional limits, whether some lives are not worth living and, if so, how to determine which are the lives that are not worth living." 329 Md. at 219, 618 A.2d at 759-60. I submit an incompetent patient's family rather than the legislature is better able to determine if this patient would rather live or die. If, as the majority suggests, the legislature develops objective criteria, rather than using the opinions of the family, as to whether a patient should live or die, we may have the appalling specter of a patient meeting the legislature's criteria and being taken off life support despite the family's unanimous belief that the patient, though never expressing a view, would have chosen to continue to live. It is doubtful that the legislature is going to accept eagerly the majority's challenge to determine "which are the lives that are not worth living." The need to accommodate diverse religious and ethical views will make any legislative decision extremely difficult. In this era of legislative concern over rising health care costs, any legislative decision might be criticized as either reducing health care costs by sacrificing lives or causing an unwarranted increase in health care costs by unnecessarily prolonging lives. It will probably prove to be almost impossible for the legislature to establish categories of which ill or dying patients should have their lives terminated. There are also troubling implications in any legislative decision. If the patient's family makes an imperfect decision, then one patient may be harmed, but if the legislature establishes imperfect guidelines, then large numbers of patients and/or their families may be harmed. Meanwhile, unless and until the legislature accepts the majority's delegation of decision-making responsibility, incompetent wards in a persistent vegetative state, who have not, while competent, clearly and convincingly evidenced their views, cannot get court approval to terminate life support. The majority has made a decision by not making a decision and may have left a significant group of incompetent patients in limbo.
Even absent legislative guidance I believe the courts have a responsibility, which they should not abdicate, to establish a procedure whereby incompetent patients, who have failed to or have never been able to clearly and convincingly evidence their views on the subject, may still, in appropriate cases, get court authorization to die with dignity. The majority acknowledges "[p]atients who are unable to exercise the right to refuse treatment for themselves, nevertheless still enjoy the right." 329 Md. at 211, 618 A.2d at 756. They then deny court implementation of that right to all incompetent patients except those who, while competent, evidenced their views in a manner that clearly and convincingly proves to a judge that the patient would choose to terminate life support.
It is conceivable that Ronald will continue to physically deteriorate to the degree that Mr. Mack might ultimately join Deanna in the view that, based on Ronald's further deteriorated condition, Ronald would no longer wish to have his life maintained by the gastrostomy tube. Under the majority opinion, because Ronald did not, while competent, clearly and convincingly evidence his views about the termination of life support, his life support system can never be terminated regardless of whether Ronald's family sometime in the future concludes unanimously that, if competent, this is what Ronald now would have wanted.
Even where an incompetent patient has not clearly and convincingly evidenced his or her views on the issue, courts ought to be able to decide, using the beliefs and opinions of those closest to the patient, what the patient's decision would be. We should not abdicate the decision-making responsibility and delegate to the legislature the responsibility for determining how courts should decide these cases.
The majority opinion recognizes that our primary goal must be to ascertain what the patient would prefer. Does the majority really believe that all people in a persistent vegetative state who have not clearly and convincingly evidenced their views about life support would prefer to remain on artificial life support indefinitely? Does the majority also believe that incompetent patients who have not sufficiently evidenced their views about life support would prefer that the legislature or a judge, rather than their loved ones, decide under what circumstances their artificial life support should be terminated?
For the reasons stated above, I would affirm the trial court.
NOTES
[1] Joanne Lynn, M.D., who served as an Assistant Director of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, has described the medical interventions for providing food and fluids. She writes:

"The medical interventions that provide food and fluids are of two basic types. First, liquids can be delivered by a tube that is inserted into a functioning gastrointestinal tract, most commonly through the nose and esophagus into the stomach or through a surgical incision in the abdominal wall and directly into the stomach. The liquids used can be specially prepared solutions of nutrients or a blenderized version of an ordinary diet. The nasogastric tube is cheap; it may lead to pneumonia and often annoys the patient and family, sometimes even requiring that the patient be restrained to prevent its removal.
"Creating a gastrostomy is usually a simple surgical procedure, and, once the wound is healed, care is very simple. Since it is out of sight, it is aesthetically more acceptable and restraints are needed less often. Also, the gastrostomy creates no additional risk of pneumonia. However, while elimination of a nasogastric tube requires only removing the tube, a gastrostomy is fairly permanent, and can be closed only by surgery.
"The second type of medical intervention is intravenous feeding and hydration, which also has two major forms. The ordinary hospital or peripheral IV, in which fluid is delivered directly to the bloodstream through a small needle, is useful only for temporary efforts to improve hydration and electrolyte concentrations. One cannot provide a balanced diet through the veins in the limbs: to do that requires a central line, or a special catheter placed into one of the major veins in the chest. The latter procedure is much more risky and vulnerable to infections and technical errors, and it is much more costly than any of the other procedures. Both forms of intravenous nutrition and hydration commonly require restraining the patient, cause minor infections and other ill effects, and are costly, especially since they ordinarily require the patient to be in a hospital."
J. Lynn & J. Childress, Must Patients Always Be Given Food and Water?, The Hastings Center Report, Oct. 1983, at 17, 18.
[2] The Restatement position also includes, as a third alternative jurisdiction, a state that has jurisdiction over the parties competing for custody. Florida clearly does not fit within the third alternative under the facts of this case.
[3] In the absence of a statute to the contrary, a nonresident may be appointed guardian. See Countryman v. Henderson, 17 Ariz. App. 218, 496 P.2d 861, 864 (1972); Ramirez v. Garcia de Bretado, 547 S.W.2d 717, 718 (Tex.Civ.App. 1977). However, appointment of a resident is preferred. See Rosin v. United Cal. Bank, 226 Cal. App.2d 166, 37 Cal. Rptr. 830, 833-34 (1964); In re Guardianship of Boutz, 24 Cal. App.2d 644, 76 P.2d 154, 157 (1938).
[4] We emphasize that this case does not deal with a terminally ill patient who has neither a living will nor a durable power of attorney, who has no guardian, and whose family and health care providers are in agreement about the use or discontinuance of life-sustaining measures.
[5] In Parts IV and V we set forth the analyses that a court may and may not use in an application to withdraw sustenance under the facts presented in this case. ET ง 13-708(c) also applies to applications by a guardian for court authorization of a medical procedure that would involve a substantial risk to the life of the ward when the object of the procedure is to attempt to save the life of the ward. Under those circumstances, in the case of a comatose ward, the analysis under ET ง 13-708(c) would be different, because of the bias of the law in favor of life. See Part III, infra.
[6] ET ง 13-708(b)(2) provides that a circuit court may include in an order appointing a guardian of the person a provision empowering the guardian "to establish [the ward's] place of abode within and without the State, provided there is court authorization for any change in abode." Thus, another factor for the circuit court's consideration is that, if Deanna were appointed guardian, she could not arrange Ronald's transfer to Florida without the approval of the Circuit Court for Baltimore County. Indeed, the circuit court could include the substance of the above-quoted statutory provision in an order appointing Deanna guardian, should the circuit court choose to exercise its discretion in that fashion.
[7] We qualify this holding by the words, "in general," because the cases uniformly recognize that the right is not absolute. It is subject to

"at least four countervailing State interests: (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession."
Brophy v. New England Sinai Hosp., Inc., 398 Mass. 417, 497 N.E.2d 626, 634 (1986) (citing numerous cases).
[8] The Attorney General cited Barber, 195 Cal. Rptr. at 490; Corbett v. D'Alessandro, 487 So.2d 368, 371 (Fla. Dist. Ct. App.), review denied, 492 So.2d 1331 (Fla. 1986); Gardner, 534 A.2d at 954; In re Jobes, 108 N.J. 394, 529 A.2d 434, 444 n. 9 (1987); Peter, 529 A.2d at 427; Conroy, 486 A.2d at 1236; Delio, 516 N.Y.S.2d at 689; In re Guardianship of Grant, 109 Wash.2d 545, 747 P.2d 445, 454 (1987). Following an "[a]ccord" signal, the Attorney General cited In re Drabick, 200 Cal. App.3d 185, 245 Cal. Rptr. 840, cert. denied sub nom. Drabick v. Drabick, 488 U.S. 958, 109 S.Ct. 399, 102 L.Ed.2d 387 (1988); Bouvia, 225 Cal. Rptr. at 306; and Brophy, 497 N.E.2d at 637.

For additional cases holding that the provision of artificially administered sustenance is a medical procedure or treatment, see, e.g., Cruzan, 497 U.S. at 288, 110 S.Ct. at 2857, 111 L.Ed.2d at 248 (O'Connor, J., concurring); id. at 307-08, 110 S.Ct. at 2866, 111 L.Ed.2d at 260 (Brennan, Marshall, and Blackmun, JJ., dissenting); Gray v. Romeo, 697 F. Supp. 580, 587 (D.R.I. 1988); In re Guardianship of Browning, 568 So.2d 4, 11-12 (Fla. 1990); In re Estate of Greenspan, 137 Ill.2d 1, 146 Ill.Dec. 860, 867, 558 N.E.2d 1194, 1201 (1990); Longeway, 139 Ill.Dec. at 784, 549 N.E.2d at 296; In re Lawrance, 579 N.E.2d 32, 40-41 (Ind. 1991); In re Guardianship of L.W., 167 Wis.2d 53, 482 N.W.2d 60, 66-67 (1992). But cf. Cruzan v. Harmon, 760 S.W.2d 408, 423-24 (Mo. 1988), aff'd sub nom. Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).
[9] In opinion No. 90-044 of September 24, 1990, 75 Op.Att'y Gen. ___, reprinted in 17:22 Md. Reg. 2635 (Nov. 2, 1990), the 1990 amendment to ET ง 13-708(b) and (c) was analyzed as a response to In re Riddlemoser, 317 Md. 496, 564 A.2d 812 (1989). In that case, a circuit court had concluded that it had no power to authorize a "Do Not Resuscitate" order sought by a guardian for an incompetent ward. This Court did not decide that question of interpretation of the pre-1990 version of the statute, because the case had become moot upon the death of the ward. The Attorney General considers the 1990 amendment to ง 13-708 as a response to the questions raised by the circuit court in Riddlemoser. See 75 Op.Att'y Gen. at ___ [No. 90-044 at 41]. We note that in Riddlemoser we commented, in dicta, that "the withdrawal of respiratory life-support or a gastric feeding tube is the termination of already existing medical treatment." 317 Md. at 504 n. 5, 564 A.2d at 816 n. 5.
[10] The precise evidence in Brophy is also instructive. As set forth at 497 N.E.2d at 632 n. 22, the evidence was as follows:

"About ten years ago, discussing Karen Ann Quinlan, Brophy stated to his wife, `I don't ever want to be on a life-support system. No way do I want to live like that; that is not living.' He had a favorite saying: `When your ticket is punched, it is punched.' Approximately five to six years ago, he helped to rescue from a burning truck a man who received extensive burns and who died a few months later. He tossed the commendation he received for bravery in the trash and said, `I should have been five minutes later. It would have been all over for him.' He also said to his brother regarding that incident, `If I'm ever like that, just shoot me, pull the plug.' About one week prior to his illness, in discussing a local teenager who had been put on a life support system he said, `No way, don't ever let that happen to me, no way.' Within twelve hours after being transported to Goddard Hospital following the rupture of the aneurysm, he stated to one of his daughters, `If I can't sit up to kiss one of my beautiful daughters, I may as well be six feet under.'"
[11] The extreme illustration of the "slippery slope" argument is presented in Alexander, Medical Science Under Dictatorship, The New England Journal of Medicine, Vol. 241, No. 2, at 39 (July 14, 1949). The article describes the annihilation of whole segments of the population and the so-called "medical" experiments on live and conscious prisoners under Nazi Germany. Dr. Alexander then summed up with these words:

"Whatever proportions these crimes finally assumed, it became evident to all who investigated them that they had started from small beginnings. The beginnings at first were merely a subtle shift in emphasis in the basic attitude of the physicians. It started with the acceptance of the attitude, basic in the euthanasia movement, that there is such a thing as life not worthy to be lived. This attitude in its early stages concerned itself merely with the severely and chronically sick. Gradually the sphere of those to be included in this category was enlarged to encompass the socially unproductive, the ideologically unwanted, the racially unwanted and finally all non-Germans. But it is important to realize that the infinitely small wedged-in lever from which this entire trend of mind received its impetus was the attitude toward the nonrehabilitable sick."
Id. at 44 (emphasis added).
[1] Similarly, Dr. Timothy James Keay, Amicus Curiae, states that "advances in medical technology are now capable of sustaining life functions well beyond any purposeful or desired outcome." Brief of Timothy James Keay as Amicus Curiae at 14. Dr. Keay is a medical doctor, and holds a Master of Arts in Theology (Ethics). He is currently Course Master in the required course in medical ethics at the University of Maryland School of Medicine and is Co-Director of the Biomedical Ethics Center of the University of Maryland at Baltimore. He is of the opinion that discontinuance of nutrition and hydration via conduits to a patient who is permanently unconscious is permissible and ethical under certain conditions. In support of his belief, Dr. Keay includes the following quotation from the textbook Clinical Ethics, which he states has been used for the mandatory course in medical ethics at the University of Maryland School of Medicine for the last four years:

(1) We propose that the state of an irreversible loss of human cognitive and communicative function implies that a `person' no longer exists in any significant sense of the term. This individual is no longer aware of self in relation to surroundings and never will be again. In our terms life has fallen irretrievably below the threshold considered minimal. (2) As a result, no goals of medicine other than support of organic life are being or will be accomplished. We do not believe this goal, in and of itself, is an independent and overriding goal of medicine. (3) Furthermore, it is difficult to know what `benefit' might mean when the patient now, and never will, be able to appreciate what is being done for him or her. (4) No preferences of the patient are expressed or known. The conjunction of these four factors justifies, in our judgment, a decision not to continue medical intervention โ that is, physicians have no ethical obligation to continue treatment. Since it is the duty of physicians to benefit their patients, in the absence of benefit, there is no duty to treat. The same argument does not, in and of itself, justify active euthanasia.
Jonsen, Siegler, & Winslade, Clinical Ethics: A Practical Approach to Ethical Decisions in Clinical Medicine, 106-07 (2d ed. 1986).
[2] At times, the Court seems to embrace the concept, with which I agree, of requiring a trial judge to consider the broad spectrum of values, beliefs, opinions, experiences, attitudes, personality, and life-style of the ward in reaching its decision. See Court's opinion at 215-217 quoting with approval Matter of Jobes, 108 N.J. 394, 529 A.2d 434, 445 (1987), In re Estate of Longeway, 133 Ill.2d 33, 549 N.E.2d 292, 300 (1989), and Brophy v. New England Sinai Hosp., Inc., 398 Mass. 417, 497 N.E.2d 626, 631-32 (1986). I would like to believe that the Court thereby accepts the true concept of substituted judgment, and would be willing to instruct trial judges that if the patient has not made previous statements concerning his or her desires with respect to the preservation of life under these or similar circumstances, or if the patient's previous statements concerning this issue are inconclusive as to intent, the trial judge can and should consider all aspects of the patient's life, values, etc., including what, if anything, he or she may have previously said concerning the subject, together with all that is known about the patient's condition and prognosis, and thereby attempt to determine what the patient, if now competent for a day and fully informed of all relevant circumstances, would decide. The Court's focus, however, remains on whether there is sufficient evidence that the patient had made a decision while competent. As much as I would like to, I cannot escape the import of the Court's language at 215: "Accordingly, the inquiry focuses on whether Ronald, while competent, sufficiently evidenced his views, one way or the other, to enable the court to determine, by clear and convincing evidence, what Ronald's decision would be under the present circumstances." This is not the substituted judgment test as I understand it, or as I would apply it in this case.
[1] Even assuming that circuit court approval would be necessary to transfer Ronald to Florida, it would probably be an abuse of discretion to fail to approve transfer of a ward to the state where the guardian resides.
[2] The majority uses the phrase "terminally ill" patients, but I submit this should be read in conjunction with the majority's statement that "court decisions dealing with withdrawing artificially administered nutrition and hydration from a patient who is in a persistent vegetative state analogize the legality of the withdrawal to the cessation of medical treatment for a terminally ill patient." 329 Md. 188, 206, 618 A.2d 744, 753 (1993).
[3] This approach is really a legislatively established "best interests" test. I submit, however, that any best interests test, judicial or legislative, should have limited applicability. The best interests test mandates that the decision to terminate life support be made relying on objective criteria, rather than family members' opinions as to what the patient would have chosen if the patient could choose. Perhaps the best interests test has applicability 1) where there is no available surrogate decision maker who is familiar with the patient; and 2) as a safeguard against bad faith or improper decisions by family members to terminate life support. Where a family's motives are suspect, a court could refuse to effectuate the family's decision to terminate life support if the court finds that decision is contrary to the patient's best interests.

The best interests test may also be helpful where there are conflicting opinions by family members, as occurred in the instant case. Measuring contrasting opinions against the objective criteria of the best interests test may aid the court in resolving the conflict. In the instant case, Judge Fader found that, because Ronald was not in pain, there was no clear best interest for Ronald. The best interests test should not be used in the manner suggested by the majority, i.e., as a separate set of objective criteria which would be applied instead of the opinions of the family. This will be further discussed in part V.